[No. 7710.   Decided July 30, 1909.]

# O. P. HOLLETT et al., Respondents, v. SAMUEL T. DAVIS, Appellant.[1]

WATERS AND WATER COURSES—SPRINGS—RIPARIAN RIGHTS—STATUTES—CONSTRUCTION.  Bal. Code, § 4114, giving the owner of land the use of waters from springs thereon, provided he can use them on his own premises, has no application to springs having sufficient flow to form water courses, and the common law rule governs riparian rights on such a water course.

SAME—RIGHTS BY PRESCRIPTION—USE FOR STATUTORY PERIOD.  A prescriptive right to the use of water for irrigation purposes, diverted from its natural channel by an upper proprietor, is not acquired by a lower proprietor, where he and his predecessors in interest used the water for domestic and culinary purposes for five years, then for two years used it for watering stock, and then for eight years constantly used the water for the purposes of irrigation.

SAME—DIVERTED WATERS—RIGHT TO RE-DIVERT—ESTOPPEL.  An upper proprietor, by the diversion of a natural water course into another channel or creek for the period of thirty years, is estopped from preventing the flow of the waters in its new course, where it appears that during such time lower proprietors had acquired title and made valuable improvements bordering upon the creek relying on the flow of water for irrigation, and that without such irrigation their lands would be valueless, although their use had not been for the statutory prescriptive period.

SAME—IRRIGATION—DIVERSION OF WATERS.  In an action to prevent the diversion of waters used for irrigation, the court cannot make a division of the waters between the upper and lower proprietors where there is no evidence as to the proportion to which each was entitled.

[1]Reported in 103 Pac. 423.

Appeal from a judgment of the superior court for Klickitat county, McCredie, J., entered February 25, 1908, upon findings in favor of the plaintiffs, restraining the diversion, and apportioning waters used for irrigation, after a trial on the merits before the court without a jury. Modified.

*W. B. Presby*, for appellant.

*E. C. Ward* and *N. L. Ward*, for respondents.

Fullerton, J.—In 1873 the predecessors in interest of the appellant settled upon, and thereafter acquired from the government, the north half of the southeast quarter of section one, in township four, north, of range fourteen, east of the Willamette Meridian. Near the south side of the tract, about midway between its east and west ends, is a large perpetual spring, the stream from which originally flowed southerly in a natural channel across the south half of the southeast quarter of section one, and across the east half of section twelve, in the same township and range, into a water course called Mill creek. The water from the spring formed a natural water course, flowing at all seasons of the year a considerable body of water. To the west of the spring, and separated therefrom by a slight ridge, was a natural channel through which water flowed during the wet season of the year, called Gilmore creek. This creek had its source to the north of the appellant's land and ran in a southwesterly direction across his land in section one, and through the west half of the northwest quarter, and the north half of the southwest quarter, of section twelve, above mentioned. Immediately south of the spring on the land in section one was a marsh, to drain which the original locator cut a ditch from a point a short distance below the spring across the ridge into Gilmore creek, and turned the water from the spring into that creek. This left dry a tract of meadow land containing eight or ten acres in section twelve; and to irrigate this tract a new ditch was cut from Gilmore creek commencing at a point about

one-fourth of a mile below the mouth of the first ditch mentioned and running in a southerly direction to the meadow. Water taken through this ditch was used intermittently for a number of years to irrigate small parts of this meadow, and water was taken from the first ditch for domestic use and to irrigate a tract of about five acres lying south of the spring, but with these exceptions all of the water from the spring was suffered to flow down Gilmore creek from 1873, until it was finally diverted in 1905 and 1906 as hereinafter stated.

In 1889 or 1890, one of the predecessors in interest of respondents settled upon the west half of the southwest quarter and the north half of the southwest quarter of section twelve. The locator of the land lived thereon for about five years, during which time he acquired title thereto from the government. The only water on the premises was that flowing in Gilmore creek, and he made use thereof during his residence on the land for domestic and culinary purposes. In 1894 he sold to the immediate predecessor of the respondents. This person did not live on the land during the two years he owned it, but made use of the water in the creek for domestic purposes and for the purposes of watering stock, hauling it from the creek to his residence. The respondents acquired the property in 1896. In that year they erected a house and barn on the premises and moved thereon with their family, where they have resided continuously until the present time. During their occupancy they have constantly used the water flowing down the creek for domestic purposes and for the purpose of irrigating an orchard and garden during the irrigating season of the year. There is no water on the premises during the dry season of the year, either for domestic use or with which to irrigate, other than that flowing in Gilmore creek from the spring arising on the appellant's premises, and without irrigation neither fruit nor vegetables can be grown thereon.

In 1904 the appellant built a dam across the original channel of the creek, above the meadow on section twelve, intend-

ing to make a storage basin for the storage of water for use in irrigating on a more extensive scale than he had been wont to do theretofore; and in that year and the two years following, turned the water of the spring therein for a period during the dry season of the year, preventing any flow of the waters down Gilmore creek to the respondents' land.

This action was brought by the respondents to enjoin this diversion. They contended, and the court below decided, that the appellant, by diverting the water for so long a time from its natural channel into Gilmore creek made Gilmore creek the natural channel of the stream from the spring, and estopped the appellant from returning it to its natural channel after the respondents had began putting it to a beneficial use. A judgment was entered in that court requiring the appellant to permit forty per cent of the water of the spring to flow down Gilmore creek during the irrigating season of the year and one-half thereof during the remaining time. This appeal is from the judgment so entered.

The appellant first contends that the court erred in holding that Gilmore creek had become the natural channel of the creek flowing from the spring, and that the respondents had acquired the rights of riparian proprietors thereon, calling special attention to the statute (Bal. Code, § 4114; P. C. § 5829), which gives to the owner of the land upon which a spring arises the use of the waters flowing therefrom, provided such owner can use the water upon his own premises.

With regard to the statute, we are of the opinion that it has no application to a spring having a sufficient flow of water to form a water course. Such a stream is as inseparably annexed to the soil as is any other, and in consequence, riparian proprietors thereon have the right to insist that the stream be permitted to flow as it is wont to flow by nature, without material diminution or alteration, save where the right to divert is acquired by grant, prescription or prior appropriation. In other words, water flowing in a natural water course which arises from a spring is not different, with respect to

the rights of riparian proprietors along the stream, from water flowing through such a course arising from any other source. What might be the rights of parties with respect to springs which do not create a water course, we are not called upon here to decide, and do not decide, but with streams of the character here in question we hold that the common law rule relating to riparian proprietors applies.

It becomes therefore material to inquire what rights the respondents have to the stream in question considered as riparian proprietors. It is said by the appellant that, since the channel in which the spring now flows is artificial with respect to the waters of the spring, the respondents must base their denial of the right of the appellant to return it to its original channel upon one or both of two grounds; namely, that they have acquired a right by prescription to have the water flow through this channel, or that the appellant is now estopped to assert the right to return the water to its natural channel, and he argues that respondents have no right by prescription and are in no position to urge an estoppel against him.

In regard to these contentions, we agree with the appellant that the respondents have no right by prescription based on their own use of the water, as it is clear there has been no such continuous use for the statutory period as would ripen into such a right; but we think they can successfully urge an estoppel. The appellant and his predecessors in interest have made this the channel for the overflow of the spring for more than thirty years, and the respondents, relying on its continued flow therein, have acquired the land bordering on the stream and made valuable improvements thereon which will become valueless if the water is now returned to its original channel. Equity and good conscience, therefore, require that the artificial channel be regarded as the natural channel, and the plaintiff should not be permitted to assert the contrary for his own benefit and the respondents' injury. The rule governing such cases is well stated by this court in the case of

*Matheson v. Ward,* 24 Wash. 407, 64 Pac. 520, 85 Am. St. 955. In that case it was made to appear that the Dungeness river, some four miles south of its mouth, originally divided into three channels, the east channel, known as "Hurd's creek channel," the center or main channel, known as the "East channel," and the one further west, known as the "West channel." That some time prior to the year 1865, some person built a wing dam across the west channel, which had the effect of diverting all of the water of the stream into the east channel and Hurd's creek channel. In 1895, after the water had been confined to the east and Hurd's channels for nearly thirty years, certain persons living along these channels again opened up the west channel and dammed the others so as to divert almost the entire flow of the river into the west channel. In 1900 owners of land along the west channel attempted to again confine the waters to the east and Hurd's channels, when the persons who had diverted it in 1895 brought an action to restrain them from so doing. The trial court denied the injunction, and its judgment was affirmed in this court. In the course of the opinion we said:

"Much evidence is quoted by appellants in their brief to the effect that many years ago there was a natural channel in the west, and that one Le Balister, in 1865, closed up this channel by a dam, and that thereafter it filled up by sediment and brush, and no water ran through it at low and ordinary high water. Conceding this to be true, viz., that prior to 1865 it was a natural channel, although the evidence is conflicting upon this point, the admissions already stated make the determination of the question one of law for the court, rather than one of fact. Even if the west channel was a natural channel, prior to 1865 and was then dammed up, and the water diverted to the east and Hurd's creek channels, where it was confined for thirty years, and this flow was acquiesced in by the riparian owners and others along the channels of said river, this would make the east and Hurd's creek the natural channels and defendants and others purchasing and improving lands along the old channel, and relying upon the flow continuing in the channels thereby formed, could not

now have their lands damaged by reason of the water being turned back by artificial means after that lapse of time. After the lapse of thirty years the channels known as the 'east and Hurd's creek' became natural channels, and the attempt of riparian or other owners to change the flow at this late day to the injury of persons on the old channel would be unlawful. According to the evidence it is probably true that in the year 1865 one Le Balister, by means of a dam or embankment, changed the flow of water out of the west channel. Conceding it to be so, the acquiescence by plaintiffs and their grantors and all riparian owners below the point of divergence for a period of thirty years has now lost them the right to change the flow from the new into the old channel."

To the same effect is *Shepardson v. Perkins*, 58 N. H. 354, where the court used the following language:

"If the landowner, having changed the direction of the natural stream through his land, were to suffer others who are entitled to use the water to expend money in reference to such use, under a belief that the new channel was to be permanent, and this were known to him, he could not afterwards change its course so as to injure the party who had expended his money. In these and like cases, whenever one who owns a watercourse in which another is interested, or by the use of which another is affected, does any act, or suffers any act to be done, affecting the rights of other proprietors, whereby a state of things is created which he cannot change without materially injuring another who has been led to act by what he himself had done or permitted, the court applies the doctrine of equitable estoppel."

And Mr. Gould says:

"When a riparian owner has diverted the water into an artificial channel, and continued such change for more than twenty years, he cannot restore it to its natural channel to the injury of other proprietors along such channel who have erected works or cultivated their lands with reference to the changed condition of the stream,  .  .  .." Gould, Waters (3d ed.), § 225.

These authorities maintain the principle that the proprietor of a stream, by diverting it into an artificial channel,

and suffering it to remain in its changed condition for a
period of time exceeding the statute of limitations, is estop-
ped, as against a person making a beneficial use of the water,
from returning it to its natural channel to that person's loss
and injury; that the user does not have to show a prescrip-
tive right in himself, or a use by himself for the period of the
statute of limitations in order to prevent its return; all he
needs to show is that the person diverting it has suffered it to
remain in its changed state for that period and that he has
made a beneficial use of the water relying upon the perma-
nency of the change.

The court in its decree directed that the water flowing
from the spring be divided so that forty per centum thereof
should be permitted to flow down Gilmore creek during the
irrigating season of the year, and one-half thereof during
other seasons. We are unable to find any basis in the record
for this division of the water. While it appears that the ap-
pellant and his predecessors in interest had irrigated a five-
acre tract lying immediately below the spring for a period of
ten years and more and three acres of it practically for
twenty-five years, and had irrigated parts of the meadow in
section twelve intermittently for nearly as long, the record
is silent as to the quantity of water thus required, or as to
what part of the total flow was actually used. So, also, it is
silent as to the proportion of the water flowing from the
spring that was permitted to flow down Gilmore creek, or
what proportion of that which was thus permitted to flow
the respondents actually used or required for irrigation and
domestic uses. No just division of the water can be made
without knowledge of these matters, and hence, we cannot in
this court direct a final decree in the case, nor can we affirm
the justness of the decree entered.

The decree appealed from will be reversed, and the case
remanded with instructions to receive such further evidence
as the parties may desire to offer on the line above indicated

as will enable the court to make a just division of the water between them, and thereafter to enter a decree accordingly.

RUDKIN, C. J., CHADWICK, GOSE, DUNBAR, and CROW, JJ., concur.