Argued April 16; reversed June 25; rehearing denied
September 10, 1935

## MINTON v. COAST PROPERTY CORPORATION ET AL.

(46 P. (2d) 1029)

*Ralph Hamilton*, of Portland (Bronaugh, Hamilton, Bynon & Bronaugh, of Portland, on the brief), for appellants.

*F. H. Greenman*, of Portland, for respondent.

CAMPBELL, C. J. The Coast Property Corporation, an Oregon corporation, is now, and for many years last past, it and its predecessors in interest have been the owners of the SW¼ of the SW¼ of section 23, T. 14 S., R. 12 W., W. M., Lincoln county, Oregon. On this land two springs or seepages arise. A portion of the land slopes somewhat abruptly to the west. Some distance up the hill, two springs or seepages arise, the waters from which seep or ooze through brushy,

swampy ground and unite a short distance from their source and form a stream at least during the wet season. It would appear as if this part of the land is in the form of an inclined plane considerably elevated at the end where the springs and seepages arise. There is no gully or canyon through which the waters from the springs and seepages flow.

Plaintiff is the owner of a parcel of land, 7.3 acres, lying in sections 22 and 23, T. 14 S., R. 12 W., W. M., adjoining the said tract belonging to the Coast Property Corporation on the west at a lower level.

On August 15, 1925, B. F. Felger, plaintiff's predecessor in interest, filed an application in the office of the state engineer for a permit to appropriate .25 of a cubic foot per second of the water from said springs and seepages for domestic and irrigation purposes. On April 16, 1927, he filed another application on the same water for a permit to appropriate .5 of a cubic foot per second to supply fishponds. Both applications were approved by the state engineer and permits granted. Thereafter said B. F. Felger built a small dam on the Coast Property Corporation's land and laid a pipe over said land to the tract now owned by plaintiff and used the water for the purposes designated in his permit.

On July 12, 1928, certificates of water right were issued by the state engineer confirming said permits. The application for the permits reads as follows: ''I * * * do hereby make application for a permit to appropriate the following public waters of the State of Oregon subject to existing rights; * * *''

Plaintiff, by *mesne* conveyances became and now is the owner of the parcel of land owned by the said Felger and succeeded to whatever rights that may have been obtained by virtue of said certificates of water right.

Plaintiff brought the instant suit to quiet title to her 7.3-acre tract of land claiming that the water right represented by said certificates were appurtenant thereto and sought to have her title to such appropriation of water decreed by the court as such an appurtenant.

Appellants and the other defendants were made parties to the suit. None of defendants, except appellants, are interested in this appeal.

Defendant Coast Property Corporation filed an answer and disclaimed any claim or interest to plaintiff's 7.3-acre tract of land, but denied that plaintiff had any right or title to the water or the use thereof attempted to be appropriated by said certificates or that such waters or the use thereof were appurtenant to plaintiff's land.

For a further and separate defense it alleged, in substance, ownership by itself and its predecessors in interest in the springs and seepages together with the land upon which they arose and from which the water was attempted to be appropriated. It further alleged that during all times prior to December, 1931, the legal title to the said land was in the Lumberman's Trust Company; that on said date the Lumberman's Trust Company conveyed said land to this defendant which has been the owner ever since; that during the time that said Lumberman's Trust Company held the title to said land, one George E. Frost was in charge of said property as attorney in fact for the real owner; that said Frost had no authority to transfer any interest or grant any easement in said land or any of the appurtenances thereto; that during said time said B. F. Felger applied to said Frost for permission to lay a pipe across said lands to said springs for the purpose of conveying the waters to what is now plain-

tiff's property; that said Frost informed said Felger that he had no authority to grant said permission to take the water or to lay a pipe over said land but did permit said Felger to lay said pipeline with the understanding and agreement that said permission was revocable at any time; that thereafter said Frost revoked said permit but that plaintiff, who is said Felger's successor in interest, has refused to remove said pipeline and claims to be an appropriator of the water of said springs and seepages with the right to divert the same from the premises on which it arises.

Upon trial, the circuit court entered a decree which, after quieting plaintiff's title to her 7.3-acre tract of land and making some other provisions from which no appeal is taken and which are immaterial to the decision of this case, further decreed as follows:

"It is further ORDERED, ADJUDGED and DECREED that as appurtenant to the above described real property, the plaintiff is entitled to the right to the use of the water from a small stream arising upon the SW¼ SW¼ of Section 23, in Township 14 South, Range 12 W. W. M., as follows:

*     *     *     *     *

The use of the said water under the above mentioned Water Right Certificates is appurtenant to the lands of the plaintiff, to which her title is quieted under this decree, and is limited to the uses specifically stated in the said Water Right Certificates, and to the volume of water permitted thereunder. The said Water Right Certificates are both in connection with the same source of supply, and the water under the same is diverted by the same dam, and transmitted through the same pipe line. The source of supply is a small stream originating upon the said SW¼ SW¼ of Section 23, in Township 14 South, Range 12 W. W. M.

It is further ORDERED, ADJUDGED and DECREED that the plaintiff and her predecessors in interest are without license, easement, right of way or any right what-

soever, in, to, or across the SW¼ SW¼ of Section 23, in Township 14 South, Range 12 W. W. M., for the purpose of establishing a diversion dam, or for the purpose of installing and/or maintaining a pipe line thereon, though plaintiff and her predecessors in good faith claimed an easement for such purposes from one without authority to grant the same.

It is further ORDERED, ADJUDGED and DECREED that this suit, be, and is hereby dismissed as to the defendants, Myrtle Helmick and Charles D. Helmick, her husband, without costs to either party."

From the part of the decree affecting the water right and entering judgment for costs, the Coast Property Corporation and George E. Frost appeal.

Let it be understood at the outset that the question presented involves the attempted appropriation of water from privately owned lands, and in no way concerns waters on public lands.

Both respondent and appellants suggest that the main question presented by this appeal is what construction should be placed upon § 47-1401, Oregon Code 1930, which reads as follows:

"All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, spring, or seepage waters of the state, shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

If the waters arising on the Coast Property Corporation's land were subject to appropriation by one not the owner of the land at the time respondent's predecessor made application to appropriate, or, if being subject to appropriation, a valid appropriation was made, then respondent has a right to the use of

said waters; but, if not so subject to appropriation, or if no valid appropriation was or could be made because the lands on which the appropriation was sought to be made were not unoccupied public lands but were privately owned lands upon which plaintiff's predecessor had made an unauthorized entry and erected a dam and installed a pipeline to conduct the water therefrom without defendant's knowledge or consent, then respondent and her predecessor in interest took nothing by virtue of said application and certificate of water right.

The legislature of this state has declared that: "All water within the state from all sources of water supply belongs to the public.": Laws of 1909; Oregon Code 1930, § 47-1401.

In 1924, the constitution of the state of Oregon was amended to read:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use." Constitution of Oregon, Article I, § 18.

It will be observed that this constitutional provision together with the foregoing sections of the statute have the effect of at least limiting the common-law riparian rights.

Section 47-1401, supra, is practically identical with section 3177, Revised Statutes of Colorado, 1908 (Laws of Colorado, 1889), from which it was probably copied. The Colorado case cited by respondent, as construing

the statute favorably to his contention, was a case where a man named Dotson, a homesteader, constructed a ditch over public lands of the United States to convey the rain water, that fell and accumulated in a gulch on public lands, to his land for irrigation purposes. Later, a man named Rinker homesteaded a piece of land over which the ditch conveying the water was built and between the source of the water and its place of use. Thereafter, Rinker sold to the railroad company which built its roadway across and filled up the ditch. Dotson then brought action for damages for destroying his water supply. The defendant answered admitting the obstruction of the ditch but claimed that the source of supply was not a running stream and therefore not subject to appropriation. The court held that the water in the gulch was a running stream under the meaning of the statute above cited, and subject to appropriation and belonged to the first appropriator: *Denver T. & F. W. R. Co. v. Dotson*, 20 Colo. 304 (38 P. 322). To the same effect see *Borman v. Blackman*, 60 Or. 304 (118 P. 848); *Wright v. Phillips*, 127 Or. 420 (272 P. 554).

The Washington case cited by respondent was a case based on a similar statute where the owner of land, upon which a spring arose forming a stream, turned the stream into a different channel and kept it running there for more than 20 years. In the meantime a homesteader took up land through which the stream flowed in its new channel and used the water for irrigation. Thereafter the owner of the land, upon which the spring arose, turned the stream back into its original channel. The court held that, the stream having been kept in its artificial channel so long, the homesteader became entitled to riparian rights on the stream in its new channel, and ordered the owner of

the land to return 40 per cent of the flow during the irrigation season: *Hollett v. Davis*, 54 Wash. 326 (103 P. 423).

In a recent decision, April 29, 1935, *California-Oregon Power Company v. Beaver Portland Cement Company*, 55 S. Ct. 725, 79 L. Ed. 754, the supreme court of the United States, in discussing the status of the common law in the Western States, said:

"Petitioner insists that prior to the adoption of the Oregon Water Code of 1909, *infra,* the common-law rule that the riparian owner was entitled to the natural flow of the stream across or along the border of his land in its accustomed channel was recognized and in full force in the State of Oregon. Respondents contend to the contrary. Both cite many Oregon decisions and argue the matter at length. But an examination of the authorities leaves the question in doubt. In dealing with cases where the parties making conflicting claims were both riparian owners, the doctrine of the common law seems to have been recognized. Other cases appear to accept what is called a modified form of the common-law rule; and still other decisions apparently enforce the rule of appropriation. It is suggested by respondent that, prior to the adoption of the Water Code in 1909, the policy in respect of water rights was developing and the law on the subject of riparian rights was in a state of flux. There appears to be reason in the suggestion. But, in view of the conclusion to which we have come, it is unnecessary to pursue the inquiry further.  *  *  *

For many years prior to the passage of the Act of July 26, 1866, c. 262, § 9, 14 Stat. 251, 253, the right to the use of waters for mining and other beneficial purposes in California and the arid region generally was fixed and regulated by local rules and customs. The first appropriator of water for a beneficial use was uniformly recognized as having the better right to the extent of his actual use. The common law with respect to riparian rights was not considered applicable,

or, if so, only to a limited degree. Water was carried by means of ditches and flumes great distances for consumption by those engaged in mining and agriculture. *Jennison v. Kirk*, 98 U. S. 453, 457-458. The rule generally recognized throughout the states and territories of the arid region was that the acquisition of water by prior appropriation for a beneficial use was entitled to protection; and the rule applied whether the water was diverted for manufacturing, irrigation, or mining purposes. The rule was evidenced not alone by legislation and judicial decision, but by local and customary law and usage as well. *Basey v. Gallagher*, 20 Wall. 670, 683-684; *Atchison v. Peterson*, 20 Wall. 507, 512-513.

This general policy was approved by the silent acquiescence of the federal government, until it received formal confirmation at the hands of Congress by the Act of 1866, *supra*. *Atchison v. Peterson, supra*.

* * * The Supreme Court of Oregon in *Hough v. Porter*, 51 Ore. 318, held that the legal effect of the language already quoted from the Desert Land Act was to dedicate to the public all interest, riparian or otherwise, in the waters of the public domain, and to abrogate the common-law rule in respect of riparian rights as to all lands settled upon or entered after March 3, 1877. The supplemental opinion which deals with the subject beginning at page 382 is well reasoned, and we think reaches the right conclusion. Subsequent decisions in Oregon are to the same effect. *Hedges v. Riddle*, 63 Ore. 257, 259-260; *Hill v. American Land & Livestock Company*, 82 Ore. 202, 207; *Allen v. Magill*, 96 Ore. 610, 618-619.''

Respondent's predecessors had a permit from the state engineer to appropriate water but such permit did not authorize him to trespass upon the land of the predecessor of the Coast Property Corporation. The fact that he went upon the land of said appellant by leave of one who had no authority to grant such leave made it none the less a trespass. Granting, for the

sake of the argument, that the legislature may declare that all the waters of the state, from whatever source of supply, ''belong to the public'', it has not said, nor has it attempted to say the land when privately owned, through and over which the water flows, belongs to the public. By virtue of the permit granted by the state engineer, respondent's predecessor had a right to make an appropriation, providing that the springs and seepages in question were a flowing stream, yet his permit gave him no authority to trespass upon appellant's land.

''Although the water is subject to appropriation, the right to appropriate must be exercised without trespass upon the land of another. The water may be running on its natural course and subject to appropriation, but no one can enjoy this bounty of the government unless he can get to the water. He may avail himself of the permission of the government to approach the stream on its land. He may secure by purchase or gift the consent of private owners to gain access over their lands, and by adverse possession for the statutory prescriptive period he may maintain his appropriation as against private owners over whose lands he has conducted the waters: *Caviness v. La Grande Irr. Co.*, 60 Or. 410, 420 (119 Pac. 731). A court of equity will not aid one who takes the water without right in the first instance, unless his possession has been continued adversely long enough to give him title by prescription.'' *Allen v. Magill*, 96 Or. 610 (189 P. 986, 190 P. 726); *Barker v. Sonner*, 135 Or. 75 (294 P. 1053).

The respondent's predecessor, having attempted to appropriate the water by going upon appellant's land without leave or license, now wishes to have the court confirm what was acquired by trespass.

That part of the decree of the circuit court appealed from will be reversed and a decree entered decreeing

that respondent has no interest in or to the waters arising on appellant Coast Property Corporation's land by virtue of the certificates of water right described in plaintiff's complaint. Neither party will recover costs in this court or the circuit court. It is so ordered.

BELT and ROSSMAN, JJ., concur.

RAND and BEAN, JJ., concur in the result.

BAILEY, J. (dissenting). The plaintiff, Sadie Minton, instituted this suit against Coast Property Corporation, a corporation, George E. Frost and other defendants, to quiet title to 7.30 acres of land alleged to be owned by her in Lincoln county, Oregon, and to have herself declared the owner of certain water rights and a pipeline used as a conduit for water carried from the corporate defendant's property to and upon her land and there put to beneficial use. Plaintiff further asks that she be decreed the "right of ingress and egress upon and over the lands and premises on which the said water rights and said water pipeline are situated, sufficient to repair, improve and maintain the reservoir, head works, intake and water pipeline, and that the defendants Coast Property Corporation and George E. Frost be forever enjoined and barred from claiming any right, title or interest in said water rights and water pipeline and from interfering with plaintiff's rights in any manner whatever".

The plaintiff's property consists of 7.30 acres in the southern part of lot 2 (fractional northeast quarter of the southeast quarter) of section 22, township 14 south, range 12 west of Willamette Meridian, lying about 1.54 chains north of the south boundary of said lot. It is a strip of land irregular in shape, 5.38 chains wide,

14.45 chains long at the northern boundary and 19.20 chains long at the southern boundary, extending from the county road on the east to the meander line of the Pacific ocean on the west. This land and the water rights claimed by plaintiff were acquired by her, through mesne conveyance, from B. F. Felger.

To the south and east of this lot lies a 40-acre tract described as the southwest quarter of the southwest quarter of section 23, which is owned by the defendant Coast Property Corporation. From a point on this defendant's quarter-section water is diverted by means of a two-inch pipeline, in a northwesterly direction across the northwest quarter of the southwest quarter of said section 23 onto plaintiff's land. The easterly part of the southwest quarter of the southwest quarter of section 23, owned by the corporate defendant, is covered with a thick growth of trees and brush and is swampy, with a slope down toward the ocean. From that part of the tract seepage water finds its way from two areas and converges in a single small stream which flows down across plaintiff's land and empties into the ocean. From the point of convergence to the farthest points where the seepage is perceptible it is a distance of 280 feet to one such area and 115 feet to the other. The evidence shows that this water originates from extensive and diffuse percolation and not from any well-defined springs. The intake of plaintiff's pipeline is located at a distance of approximately 60 feet below the convergence.

Mr. Vic Hert in 1879 was in a surveying party that surveyed all the land hereinabove described, and at one time was a part owner of the land. As a witness in this case he testified that, ''There has always been a little stream'', and further said: ''Well, I always called it a little stream of water running down a little

creek. I never went up to the mountains where the boys talk about springs. I would always see running water down where I was. * * * It is a little stream of water running there all the time. Well, it run . . . the farther down towards the beach it got the more water there was, but there was always a little stream of running water there. Of course, there was more in the winter time than in the summer time, but it was a stream running maybe a foot or two wide, across, and six inches deep in places, and two inches deep in places.'' On cross-examination he testified as follows:

"Q. When you speak of the size of the stream, you are speaking of it down where it appeared upon your land, are you? A. Well, it was all on the land we owned once. That whole section in there.

"Q. Did you own the southwest of the southwest of section 23? A. Yes. Q. You owned it at one time? A. Yes, owned an interest in it.

* * * * *

"Q. When you speak of the stream do you speak of it down about the place where the plaintiff's buildings are? A. Oh, all the way up to the timber line as far as that is concerned.

"Q. How far from the section line between 22 and 23 is it to the timber? * * * A. Well, I should judge, I am just guessing at this of course, I would think probably eight hundred feet, maybe six hundred or something. Q. To the timber or brush? A. It runs through brush now nearly all the way.''

On being questioned as to whether in describing the size of the stream he had reference to its flow at or below the highway, he said: "No, sir. I described it where this little water runs up, where it runs out of the main timber, you might say. Fifty years ago I had it in oats, plowed ground up where it is 50 feet high now in timber. But water came out right in the

big timber, and there is a little stream of water always running and farther down towards the beach it got the more water there was in it."

Mr. Felger testified that in dry seasons there was "not any too much water" in the stream, and that at extreme low stage a two-inch pipe would carry nearly all of it. This witness further testified that he had lived there two or three years and had never seen the stream dry, and that there was always a little stream running. From the point of convergence, referred to as "the fork", to the intake, and from there on down the stream increased in size. In answer to this question by the court: "Between the place where the water comes out of the ground and the dam, before you did any work there, what was there to indicate that it was the water-course?" he said: "Well, there was the water running there. There was a lot of water running." On being further asked by the court: "Was there anything like a creek bed or rocky bed?" he answered: "There was a rocky bed there where I put in the little dam, quite rocky, and from there, then, the water dropped off pretty fast."

Mr. Cooper, another witness, testified that the water was running above the place of convergence and gave further testimony as follows:

"Q. Was there banks on the sides? A. Not very much until you get below the dam.

"Q. Was there any at all, any banks at all? A. Well, there was a little bank, yes.

\*     \*     \*     \*     \*

"Q. Now, from the intake on, what did you find? How about the bed and the creek? Was there banks to that? A. Yes, it got more banks all the way down."

Mr. Marlowe, who had known the stream for several years, stated that during the last two years, when he

had frequently seen it, he had not known the stream to be dry. He testified further:

"Q. Now, from the source down to the intake or the dam and intake, what did you find? A. A stream of water. Q. Quite a stream of water? A. Yes, sir.

＊　　　　＊　　　　＊　　　　＊　　　　＊

"Q. From the reservoir [intake] down, I will ask you what the condition of the stream is. A. It is running all the way down. There is one place where it buries itself, goes down under the root of a tree and comes up on the other side. That is the only place where it is buried."

The testimony of at least two witnesses is to the effect that the water above the fork of what may be termed the two branches of the stream could be seen running but was in places three or four feet wide and in other places spread over eight or nine feet, although its flow was easily discernible. It was not, however, until the two branches joined that the water was confined to narrow limits or to a defined channel.

The foregoing constitutes substantially all the testimony relating to the source and character of the stream. The only evidence offered by any of the defendants was the introduction of certified copies of the applications made by Felger to appropriate the water. In resting their case the defendants stated, through counsel, that they had a number of witnesses called "for the purpose of showing the nature of the water supply, the source of it and the nature of it. However, their testimony would be substantially the same as the witnesses already called by the plaintiff. So, there is no use in taking the court's time for the presentation of such testimony".

On August 15, 1925, Mr. Felger made application to the state engineer to appropriate .23 cubic foot of

water per second, for domestic and irrigation purposes on the land then owned by him. The point of diversion was defined as being "1,000 feet east of the Roosevelt highway or 600 feet east and 200 feet south of the northwest corner" of the southwest quarter of the southwest quarter of section 23, the means of diversion being a two-inch pipeline approximately 1,500 feet in length and terminating on property of the applicant. It was further stated in the application that a small reservoir might be constructed to hold water for irrigation and domestic purposes. Later, on April 16, 1927, the same applicant sought permission to make a further appropriation of .5 cubic foot of water per second from the same stream, to use for supplying fish ponds on his land.

The first of these applications was granted by the state engineer as of June 1, 1926, on condition that actual construction work was to begin on or before June 1, 1927, and be completed by June 1, 1928. The later application was granted on April 23, 1927, work to begin on or before June 1, 1929, and be completed on or before October 1, 1930. An extension of one year was applied for and granted, within which to commence and complete the construction incident to the first application. On July 12, 1928, two certificates of water right were issued by the state engineer to Mr. Felger, one for the appropriation of .23 cubic foot of water per second for domestic and irrigation purposes, and the other for .5 cubic foot per second for supplying fish ponds. The pipeline had been laid and the amount of water covered by the certificates had been appropriated and applied to the uses therein specified, prior to the issuance of such certificates.

The plaintiff, in obtaining title to the tract of land owned by her, became also the owner of a five-sevenths

interest in whatever rights Felger acquired by and through the foregoing proceedings and the appropriation of the amount of water thereby obtained to a beneficial use.

The testimony is uncontradicted that Felger, after making the applications above referred to and before constructing the pipeline to the point of diversion on the corporate defendant's property, applied to and obtained permission from one George E. Frost to lay the pipeline. The defendants Coast Property Corporation and George E. Frost in their answer, after alleging that the property was, at all times mentioned, up to September 23, 1931, owned by Sir Robert Perks of London, England, and was held by the Lumbermen's Trust Company as trustee for said Perks, aver:

"That at all of said time this defendant, George E. Frost, was the attorney and agent of said equitable owner, and was in charge of said property for him, but that at no time did the said George E. Frost have any power or authority to convey said real property or any part thereof, or any right therein. That prior to the 4th day of August, 1932, and while the legal title to the property described in paragraph I of the complaint was vested in said Lumbermens Trust Company as such trustee, the defendant, B. F. Felger, applied to the said George E. Frost for permission to take water from a spring originating upon said southwest quarter of the southwest quarter ($SW\frac{1}{4}$ $SW\frac{1}{4}$) of said section twenty-three (23), and to lay a pipeline across said land to convey such water to the land described in paragraph I of the complaint. That the defendant, George E. Frost, then and there informed said defendant, B. F. Felger, and said defendant, B. F. Felger, had full knowledge that the defendant, George E. Frost, had no power or authority to give any right to take or use said water, or any easement, or right of way for a pipeline over said land belonging to said equitable owner, but said George E. Frost permitted said B. F.

Felger to lay said pipeline with the understanding and agreement between said Frost and said Felger that the right to lay and maintain said pipeline was merely a permissive right and revocable at any time at the election of the owner of the land upon which said pipeline was laid. Thereafter it was agreed between said Frost and the defendants, Helmicks, who had acquired title from said Felger, that the owner or occupant or tenant of said southwest quarter of the southwest quarter ($SW\frac{1}{4}$ $SW\frac{1}{4}$) of said section twenty-three (23), should have the right to connect a pipe with said pipeline, and thereby take water from said pipeline for use upon the land last above mentioned.''

It is next alleged that ''under said revocable permission and pursuant to said agreement between said Felger and said Frost'', Felger laid said pipeline and conveyed the water from the stream to the property now owned by plaintiff; and that thereafter the said Frost caused a water pipe to be connected with said pipeline to obtain water for the use of a tenant on the property owned by said corporate defendant.

There was no contest over the ownership of the real property claimed by the plaintiff and her title thereto was quieted by the court. The court further held that the use of the water under the water right certificates hereinbefore mentioned was appurtenant to her land and was limited to the uses and volume specified in the certificates; and that the source of the supply was a small stream originating on the defendant corporation's land. It was further decreed that the plaintiff and her predecessors in interest ''are without license, easement, right of way or any right whatsoever'' in, to or across the southwest quarter of the southwest quarter of section 23 for the purpose of establishing a diversion dam or to install and maintain a pipeline thereon, ''although plaintiff and her predecessors in

good faith claim an easement for such purposes from one without authority to grant the same". From that part of the decree awarding a right to the use of the water to the plaintiff the defendants Coast Property Corporation and George E. Frost have appealed.

The appellants state that "the determination of this case depends largely upon the construction to be placed on § 47-1401, Oregon Code 1930". In oral argument counsel for appellants contended that under said section "the water arising from those springs or seepage belongs to the owner of the land and is not subject to appropriation". The section referred to is as follows:

"All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, spring, or seepage waters of the state, shall be governed by the same laws relating to priority of right as those ditches constructed for the purpose of utilizing the waters of running streams; provided, that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters."

At the time this law was enacted, 1893, there was no statute regulating the appropriation of water by individuals. The courts, however, had in numerous decisions, in this and other western states, held that the prior appropriator of water to a beneficial use acquired a right superior to any subsequent appropriator, to the extent of the use made of such prior appropriation. It was not until 1909 that any comprehensive system of regulating the method of appropriation and determining the relative rights of appropriators was enacted into statutory law.

In enacting § 47-1401, supra, the legislature, impliedly at least, recognized the right of individuals to appropriate water from running streams for beneficial uses. By the enactment of this section the legislature

gave its approval to ditches already constructed and sanctioned ditches to be constructed in the future for the purpose of utilizing the waste, spring or seepage waters of the state, and provided that such ditches should be governed by the same laws relating to priority of right that apply to those ditches constructed for the purpose of utilizing the waters of running streams. The proviso, "that the person upon whose lands the seepage or spring waters first arise, shall have the right to the use of such waters" is limited by the purview of the act, and can have reference only to waste, spring or seepage waters: *Meyers v. Pacific States Lumber Company*, 122 Or. 315 (259 P. 203); *Olson v. Heisen*, 90 Or. 176 (175 P. 859); *State v. Young*, 74 Or. 399 (145 P. 647).

This court in *Meyers v. Pacific States Lumber Company*, supra, quoted with approval from the opinion written by Mr. Justice Story in *United States v. Dickson*, 15 Peters 141 (10 L. Ed. 689), as follows:

"* * * where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that proviso is construed strictly, and takes no case out of the enacting clause which does not fall fairly within its terms. In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception, must establish it as being within the words as well as within the reason thereof."

The proviso, therefore, of § 47-1401, supra, does not, and was not intended to, grant to the owner of land upon which seepage and spring waters first arise the use of such water after it becomes part of a running stream, as against a prior appropriator.

The construction which we place on this proviso becomes more obviously indicated when we bear in mind

that most running streams have their origin principally either in seepage, springs or percolating waters. In the case of *In re German Ditch & Reservoir Co.,* 56 Colo. 252 (139 P. 2), the court, in stating that the rights of a prior appropriator from a stream can not be impaired by subsequent appropriation of water from its tributaries, quoted with approval from an earlier Colorado decision *Strickler v. City of Colorado Springs,* 16 Colo. 61 (26 P. 313, 25 Am. St. Rep. 245), as follows:

"All large streams are dependent on tributaries for a supply of water. To cut off the water from such tributaries would be to destroy the capacity of the stream to the injury of those below. It would result in ruinous and useless expenditures of money in a race between rival claimants in the extension of ditches towards the source of water supply, and reward success at the expense of the rights of prior appropriators."

In *Rock Creek Ditch & Flume Company v. Miller,* 93 Mont. 248 (17 P. (2d) 1074, 89 A. L. R. 200), it is said:

"Where vagrant, fugitive waters have reached a natural channel, and thus have lost 'their original character as seepage, percolating, surface, or waste waters', they serve to constitute a part of the watercourse, and are subject to appropriation."

In the case of *Malad Valley Irrigation Company v. Campbell,* 2 Idaho, 411 (18 P. 52), in denying the right to take water from springs which constituted the principal and immediate source of supply of a creek, the court said:

"If persons can go upon the tributaries of streams whose waters have all been appropriated and applied to a useful and legitimate purpose, and can take and control the waters of such tributaries, then, indeed, the sources of supply of all appropriated natural streams may be entirely cut off, and turned away from the first and rightful appropriators."

With reference to a statute similar to our § 47-1401, supra, the opinion in *Miller v. Wheeler,* 54 Wash. 429 (103 P. 641, 23 L. R. A. (N. S.) 1065), disposing of the appellant's contention that the owner of the property on whose land the seepage or spring water first arises shall have the prior right to such water, said:

"A review of the authorities will show that a clear distinction is drawn between springs rising or seeping upon lands and from which there is no outlet, and springs which form the fountainheads of living watercourses. The court below has found (otherwise its decree could not be sustained) that there was a living flow from these springs. They thus become a part of the Squillchuck waters, and therefore subject to appropriation."

The statutes of Washington, in § 5829 of Pierce's Code, 1901, provided as follows:

"All ditches now constructed, or hereafter to be constructed, for the purpose of utilizing the waste, seepage, or spring waters of the state, shall be governed by the same laws as those ditches constructed for the purpose of utilizing the waters of natural streams and lakes; provided, that the person upon whose lands the seepage or spring waters first rise shall have a prior right to such waters, if capable of being used upon his lands."

The supreme court of Washington in *Hollett v. Davis,* 54 Wash. 326 (103 P. 423), said:

"With regard to the statute [§ 5829 of the code above referred to], we are of the opinion that it has no application to a spring having a sufficient flow of water to form a watercourse. Such a stream is as inseparably annexed to the soil as is any other, and in consequence riparian proprietors thereon have the right to insist that the stream be permitted to flow as it is wont to flow by nature, without material diminution or altering, save where the right to divert is acquired by grant, prescription, or prior appropriation."

The Oregon supreme court in *Hildebrandt v. Montgomery,* 113 Or. 687 (234 P. 267), referred to the foregoing section of the Washington code and quoted with approval from *Hollett v. Davis,* supra, to the effect that "that statute has no application to a spring having a sufficient flow of water to form a watercourse".

The Colorado supreme court in *Nevius v. Smith,* 86 Colo. 178 (279 P. 44), construing a statute similar to the Washington act above set out, which contained this proviso: "Provided, that the person upon whose lands the seepage or spring waters first arise, shall have the prior right to such waters if capable of being used upon his lands", said:

"It appears, however, by the complaint and by the adjudication decrees that plaintiff's right is to 'percolating, seepage and spring waters,' and defendants claim that, under C. L. § 1637, such appropriations are always subject to a paramount right of the owner of the land on which the waters arise, to use them when occasion requires, and that the adjudications must be regarded as made subject to such right, even though such owner made no such claim at the time of the decree of adjudication, and even though such right was not reserved therein. Whether defendants' position is right is the first and main question we have to meet.

\* . \* \* \* . \*

"The argument of defendants, based on decisions from other states, that percolations belong to the owner of the soil, is unsound in Colorado. Ever since Comstock v. Ramsay, 55 Colo. 244, 133 P. 1107, we have held that seepage and percolation belong to the river \* \* \*."

After citing numerous cases the opinion continued as follows:

"These cases refute any claim that percolation or seepage of any water belongs to the landowner, and fix the principle that any appropriation of it must be subject to all prior appropriations from the river,

which seems in accord with the main part of the above-quoted statute, but are contrary to the proviso thereof."

We shall now review briefly a few of the Oregon decisions which are pertinent to the question before us. In the case of *Boyce v. Cupper*, 37 Or. 256 (61 P. 642), this court observed:

"It is contended by defendant's counsel that the water from these springs situate on their client's land, not being confined to any ascertained surface or subterranean channel, is a part of his estate, and this being so, he has a right to permit it to flow into and down the creek to the Anderson place, and there capture and use it in irrigating said land. The rule is general that water percolating the soil beneath the surface, the course of which is unknown and unascertainable, belongs to the realty on which it is found: [citing numerous authorities]. The springs and marshes situate on defendant's pre-emption and homestead claims having no perceptible outlets, the water percolating the soil therefrom continued to be his property as long as it remained a part of the soil with which it was intermingled, but when it reached the channel of the creek defendant's property therein ceased, because it had passed his power of ordinary control. In the absence of surface water caused by rains or melting snow, the volume of water found in the bed of a stream necessarily depends upon the springs which furnish the supply. If such springs have a well-defined channel which conducts the water into a stream, an appropriation of the waters of the latter is *ipso facto* an application of the water of the springs to a beneficial use: Low v. Rizor, 25 Or. 551 (37 P. 82). When a stream is supplied by percolation, if the ownership of the water, after it reached the channel, continued in the person from whose land it imperceptibly emanated, thereby entitling him to recapture it in the stream at any point below, the right of prior appropriation would be practically denied; but, as such right is fully recognized and firmly established by the courts

in the arid regions of the Pacific coast states and territories, it follows that the right insisted upon does not exist.''

In *Morrison v. Officer,* 48 Or. 569 (87 P. 896), the court referred to the proviso of the statute now known as § 47-1401, supra, and said: "When a spring furnishes a stream of water that rises to the surface, the right of appropriation attaches:" citing the case of *Brosnan v. Harris,* 39 Or. 148 (65 P. 867, 87 Am. St. Rep. 649, 54 L. R. A. 628).

This court, in *Henrici v. Paulson,* 134 Or. 222 (293 P. 424), held that the water there referred to did not form a running stream. Such water was mentioned in the opinion as "private", in distinction from "public" waters. In discussing that matter the opinion continued as follows:

"The statute of this state, providing for appropriation for beneficial use of the waters of the state, provides for such appropriation of public waters and not of private waters: Or. L., §§ 5715, 5716. The existing rights or vested rights are carefully preserved by the provisions of the statute. The plain language of section 5797 settles the question in this case in favor of plaintiffs. In the enactment of the water code the legislature did not intend or attempt to authorize the appropriation of private property in water to which a right is recognized in the owner of land upon which spring waters first arise by virtue of Or. L., § 5797. The power to appropriate private property does not reside in the law-making body of the state. *After the water from a spring passes therefrom or is mingled with the water of a running stream, a different rule applies.* We are not here interested in the rights of an appropriator of the waters of a spring on public land, as against a subsequent donee or grantee of the government or the right to appropriate waters, having their source in a spring on private property but which flow between well-defined banks, so as to constitute an actual stream or watercourse." [Italics supplied.]

In the case of *Klamath Development Company v. Lewis,* 136 Or. 445 (299 P. 705), this court seems to have recognized a distinction between spring waters which do not rise to the surface and form a channel, and the waters of a spring there concerned which formed a stream, for in that instance it is said:

"Practically all of the testimony is to the effect that prior to on or about February 20, 1925, when the waters thereof were first diverted by artificial means under an express agreement with plaintiff the spring in question at all times was upon plaintiff's property and by reason of seepage and evaporation would not flow in any channel or to or upon adjacent property. Such a spring is not subject to appropriation by a person other than the owner of the land: § 47-1401. Oregon Code 1930; Morrison v. Officer, 48 Or. 569 (87 P. 896); 2 Kinney on Irrigation and Water Rights, § 648, p. 1135, note 9."

In 1 Wiel on Water Rights (3d Ed.), p. 357, § 336, we find:

"Water from a spring is water in a watercourse, however small, if it runs off in a definite channel, with a tendency to regularity, and may be appropriated as water in a watercourse, even though the appropriator builds a ditch to the very mouth of the spring."

It is contended that many of our decisions construing § 47-1401, supra, were those involving public lands, but in applying the law to the facts the court in rendering opinions in those cases did not rely upon that distinction or make the application of the section with reference to public lands different from its application to private lands. The effect of our earlier decisions on the subject is to make clear, in this instance, that water arising from springs or seepage on the defendant corporation's land, after it has become part of a running stream, is as much subject to appropriation by one

other than the owner of the land where such water first arises, as though that stream had its origin in some remote place above that defendant's land and merely flowed through it.

Sir Robert Perks was the owner of the southwest quarter of the southwest quarter of section 23 until the organization of the defendant corporation on or about September 23, 1931, and was not a resident of Oregon. In September, 1931, this property was transferred to the defendant corporation, which has ever since been the owner of it. In their answer this corporation and George E. Frost allege "that at all of said time [the period when the land was owned by Perks] this defendant, George E. Frost, was the attorney and agent of said equitable owner [Perks] and was in charge of said property for him, but that at no time did the said George E. Frost have any power or authority to convey said real property or any part thereof, or any interest therein". By her reply the plaintiff admits that the said George E. Frost was, during that time, the attorney and agent of Sir Robert Perks and was in charge of the property for that owner.

The remainder of the answer, hereinbefore quoted, is denied by the plaintiff in her reply, with the exception of that part of it which alleges that the said Frost permitted B. F. Felger to lay the pipeline. No attempt was made by these defendants to prove the understanding alleged to have been had between Frost and Felger as to revocability of the permissive right by the owner of the land.

Since it is admitted by these defendants that said Frost was the agent and attorney of the owner of the southwest quarter of the southwest quarter of section 23 and the evidence is undisputed that Frost accorded

Felger permission to lay the pipeline and take water from the stream on that land, it can not be said that the appropriation of such water by Felger was effected through "trespass upon the land of another".

Frost is one of the appellants in this case. He is represented here, and was represented in the circuit court, by the same counsel appearing for the defendant corporation. Just what interest he has in this litigation the record fails to disclose. He did not take the witness stand and explain what was his conversation with Felger. It is natural that since Sir Robert Perks was not living in this country he would have some one in charge of his property and looking after his interests. Mr. Frost was active in caring for this property and assisting in.its disposal when an opportunity was presented. It was not until the land had passed out of the possession of Perks and into that of the corporation that any difficulty arose over the use of the water by Felger or his successors in interest.

When the water code was adopted in 1909 it was provided that: "All water within the state from all sources of water supply belong[s] to the public:" § 47-401, Oregon Code 1930. The code provides the method of obtaining permission to appropriate water, and applying it to beneficial use. When it is made to appear to the satisfaction of the state engineer that any appropriation has been perfected, it becomes the duty of that officer to issue a certificate of water right: § 47-508. By § 47-807, Oregon Code 1930, a water right certificate issued in accordance with the provision of § 47-508, "which, after the expiration of three months from the date it is issued, has not been contested and cancelled in the manner provided" in the water code, becomes "conclusive evidence of the priority and extent of the appropriation therein described * * *

except in those cases where the rights of appropriation thereby described shall have been abandoned subsequent to the issuance of such certificate". When the owner of the perfected and developed water right ceases or fails to use the water appropriated, for a period of five successive years, the right to use said water shall thereupon cease: § 47-901.

The supreme court of the United States in its opinion in *California-Oregon Power Company v. Beaver Portland Cement Company,* decided April 29, 1935, with reference to our statutes relating to appropriation of water, said:

"In 1909 the water code was adopted by the state legislature. Ore. Laws 1909, chap. 216. The act provides that all water within the state shall be subject to appropriation for beneficial use; but nothing therein is to be construed to take away or impair any vested right. In respect of a riparian proprietor, a vested right is defined 'as an actual application of water to beneficial use prior to the passage of this act * * * to the extent of the actual application to beneficial use.' "

The court then referred to what is commonly known as the Desert Land Act of 1877 and held that the act applies not only to desert land entries but also to lands patented under the pre-emption and homestead laws and subject to state control, and that all non-navigable waters which were a part of the public domain in 1877 "became *publici juris* subject to the plenary control of the designated states". The opinion closes with this statement:

"The public interest in such state control in the arid-land states is definite and substantial. In Clark v. Nash, 198 U. S. 361, 370, this court accepted that view to the extent of holding that in the arid-land states the use of water for irrigation, although by a private

individual, is a public use; and sustained as constitutional a state statute which, for purposes of irrigation, permitted an individual to condemn a right of way for enlarging a ditch across the land of another.''

In the case at bar no question is raised as to the regularity of the application made by Felger for the use of the water. Likewise, the certificates issued by the state engineer are not questioned. Nor is there any intimation that the use of the water was abandoned.

Even if the right to go upon this land, given by Frost to Felger, be withdrawn, leaving plaintiff no present right to maintain a pipeline over and upon the corporate defendant's land, nevertheless she has five years from the time of withdrawal of such permissive right to go upon said land before losing her right to the use of this water. She may elect to change the point of diversion so as to take the water from some other point on the stream: § 47-712, Oregon Code 1930.

At the time the water code was adopted in 1909 the legislature provided for condemnation of right of way by those seeking to appropriate water to a beneficial use. The supreme court of the United States had already decided in *Clark v. Nash,* 198 U. S. 361 (49 L. Ed. 1085, 25 S. Ct. 676, 4 Ann. Cas. 1171), that a similar statute of Utah granting this right to an individual was constitutional.

In *Smith v. Cameron,* 106 Or. 1 (210 P. 716, 27 A. L. R. 510), this court, on November 28, 1922, held the Oregon law relating to condemnation by individuals unconstitutional, as violative of article I, § 18, of our organic act. In 1924, however, the electorate of the state amended this section of our constitution by adding thereto the following: ''Provided, that the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or

farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state and is declared a public use.''

In 1927 the Oregon legislature passed what is now § 37-418, Oregon Code 1930, extending the right of eminent domain to the United States, the state or any person, firm or corporation, to effect condemnation ''for the construction, maintenance, repair and use of all necessary reservoirs, dams, water gates, canals, ditches, flumes, tunnel or other means of securing, storing and conveying water for irrigation or for drainage, or any other beneficial purpose, upon payment of just compensation therefor''. At the time the pipeline here involved was laid, Felger, under the constitutional and statutory provisions above mentioned, had the right, in the event that permission was not readily given him, to condemn a right of way across the southwest quarter of the southwest quarter of section 23, for the purpose of constructing his conduit and diverting water from the stream, as the right to the use of such water had been granted to him by the state engineer. The evidence is to the effect that Felger had advice that he might have to pay damages to the owner of the land, and he testified that he offered to pay to Frost any damages incidental to effecting his diversion of water, and Frost stated that there was no damage. This testimony is not contradicted by the defendants. Even if we were to assume that Felger was not granted permission to construct the conduit across the land of another, nevertheless it is doubtful, inasmuch as he had the right to condemn a means of access to the water, that he could, under the facts in this case, be considered a trespasser. Frost, the agent of Perks, knew what was being done. He made no protest to the construction of the pipeline or the use of the water.

In *Roberts v. Northern Pacific Railroad Company,* 158 U. S. 1 (39 L. Ed. 873, 15 S. Ct. 756), the court pointed out that it had "been frequently held that if a landowner, knowing that a railroad company has entered upon his land and is engaged in constructing its road without having complied with the statute, requiring either payment by agreement or proceedings to condemn, remains inactive and permits them to go on and expend large sums in the work, he will be estopped from maintaining either trespass or ejectment for the entry, and will be regarded as having acquiesced therein, and be restricted to a suit for damages". This rule has often been applied, not only in the instance of entries by railroads but other entries upon land wherein the right of eminent domain existed. For cases of this sort involving irrigation, see: *Edwards v. Roberts,* 26 Colo. App. 538 (144 P. 856); *Gustin v. Harting,* 20 Wyo. 1 (121 P. 522, Ann. Cas. 1914C, 1911); *Miocene Ditch Company v. Jacobsen,* 146 Fed. 680 (C. C. A., 9th circuit). See also, generally, Rose's notes to *Roberts v. Northern Pacific Railroad Company,* supra.

In the case at bar the plaintiff did not plead estoppel but, according to the statement during oral argument, she has now instituted an action to condemn a right of way for the pipeline. The fact that she did not plead estoppel in the present suit does not, however, convert her entry upon the land into a trespass. In several of the cases cited in Rose's notes to the Roberts case, supra, the courts have enjoined the landowner from interfering with the construction on his land until the conclusion of condemnation proceedings. Had there been any objection to Felger's entry, condemnation proceedings doubtless would have been instituted by

him, or he would have made arrangements to divert the water from the stream at some other point.

The plaintiff purchased her land after the water had been diverted from the stream on the defendant corporation's tract, paying for it the sum of $4,800. Prior to her purchase the property had been used, and is now being used as a home and a tourist camp. The water is being used for domestic purposes, for irrigating gardens and flowers and to supply a pond for the propagation of fish.

A reversal of the decree appealed from and a dismissal of this suit would destroy to a great extent the value of plaintiff's property and would not only deny her the statutory privilege of condemning a right of way hereafter for the diversion of this water but would also deny her the use of the water, which the record shows was regularly and legally acquired by her and her predecessors in interest. It would further destroy her priority in the use of the water of this stream, even where it flows through her own property, for such a reversal would have the effect of decreeing that she had no interest whatever in the waters of this stream, no matter how acquired.

Nothing that has been said in this dissenting opinion should be construed as a determination of the condemnation proceedings now pending. The opinion is limited to the facts as they appear in the instant case.

The decree appealed from should in all respects be affirmed.

KELLY, J., concurs.