[Sac. No. 2465.   In Bank.—February 27, 1918.]

## E. CLEMENS HORST COMPANY (a Corporation), Appellant, v. NEW BLUE POINT MINING COMPANY et al., Respondents.

[Sac. No. 2466.   In Bank.—February 27, 1918.]

## RALPH H. DURST, Appellant, v. NEW BLUE POINT MINING COMPANY et al., Respondents.

[Sac. No. 2467.   In Bank.—February 27, 1918.]

## ROSE FRANCES DURST, as Executrix, etc., Appellant, v. NEW BLUE POINT MINING COMPANY et al., Respondents.

WATERS AND WATER RIGHTS—"FOREIGN" WATERS—RIGHTS OF RIPARIAN OWNERS.—Those who augment water of a stream by the addition of water brought from sources outside the watershed may at their pleasure discontinue such increment and leave without remedy riparian owners below, who cannot by adverse possession or user obtain any easement or right against those who thus add to the *corpus* of the stream.

ID.—RIGHT OF LOWER AGAINST UPPER RIPARIAN OWNERS.—Where, in an action by lower riparian owners against upper riparian owners to restrain a diversion of waters, it appeared that for upward of half a century the waters of the stream, the rights to which were in question, had been augmented by foreign waters made up of sewage from a city and water discharged from mines, mills, and other sources, all without the watershed of the stream, and that these were the waters which the plaintiff sought to enjoin the defendants from taking, the defendants had the right to invoke the rule that the plaintiffs must rely upon the strength of their own title and not upon the weakness of that of their adversaries.

ID.—RIGHT TO ABANDONED WATERS.—Since the surplus or foreign waters, in such case, would not, in the course of nature, reach the land of the riparian owner below, that owner may not complain of being deprived thereof by the producers of the excess or by their assignees, or by a stranger to their title who appropriated it.

ID.—RIGHT TO USE FOREIGN WATERS OUTSIDE WATERSHED.—In such case those who first secured the abandoned foreign waters may not be deprived of the use of it, even outside of the stream, by one claiming as a lower riparian proprietor on the stream.

Id.—Judgment—Certainty.—Where in such a case the court found that the foreign water in the stream is never less than five hundred inches nor more than one thousand four hundred inches, and that the natural flow is always at least 1,191 inches, a judgment adjudging the defendants to be entitled to all the foreign water not exceeding one thousand four hundred inches and enjoining them from taking more than that quantity is not open to attack as being uncertain.

Id.—Judgment—Evidence not in Record—Findings Justified by Evidence.—Under the rule favoring the sustaining rather than the reversal of judgments, it will be assumed that evidence not set forth in the record justifies the findings, and that a judgment is in accordance with fairness and equity.

Id.—Jurisdiction of Subject of Action—County Where Action Commenced.—Where the plaintiff sought to quiet its title to the natural flow of water of a river at the plaintiff's lands in Yuba County, the mere fact that a tributary creek had a separate name and extended through another county did not make it less a part of the river, and the trial court properly found that the plaintiff's right sought to be quieted was a part and parcel of the plaintiff's Yuba County lands, so that the superior court of Yuba County had jurisdiction of the action under section 5 of article VI of the constitution.

APPEAL from a judgment of the Superior Court of Yuba County. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

W. H. Carlin, and Samuel C. Wiel, for Appellants.

Bert Schlesinger, James F. Sheehan, C. J. Heggerty, Knight & Heggerty, F. T. Nilon, Byron Coleman, and John Mulroy, for Respondents.

MELVIN, J.—Plaintiffs appeal from parts of judgments identical in three cases involving the flow of Bear River and its tributary, Wolf Creek, to the lands of plaintiffs in Yuba and Placer counties. The three appeals are by stipulation to be governed by the decision based upon the transcript in the case entitled "E. Clemens Horst Company *v.* New Blue Point Mining Company."

E. Clemens Horst Company (hereinafter to be known as "plaintiff" or "appellant") has owned for more than a quarter of a century land riparian to Bear River. The water flowing to said land comes partly from a tributary of Bear

River known as Wolf Creek, which has its confluence with the river above plaintiff's land. Upon Wolf Creek the predecessors of defendants maintained a dam. This dam was completed in 1862 and was constructed at large cost, and has been maintained by defendants or their predecessors in interest ever since. Heading at this dam was a ditch sometimes known as the "Campbell Ditch." It was twenty-eight miles long. Two miles from its head this ditch crossed a tributary of Wolf Creek known as French Ravine, and no water carried beyond French Ravine in said ditch ever did, now does, or can return to Wolf Creek or Bear River above the land of plaintiff.

Beginning in 1862 two thousand inches of water was carried by said ditch in the winter-time each year and not returned to either the creek or the river, being used in gravel mines at Smartsville. A small quantity has been and still is distributed in such manner that a portion of it has been returned to the stream above the land of plaintiff, but as there is no controversy over this water it will not be considered in this opinion. Winter diversions through the ditch continued until 1883, when the mining at Smartsville outside of the watershed of Bear River and Wolf Creek was stopped by injunction. Between 1883 and 1910 no water in winter was carried by the ditch outside of the said watershed.

In the irrigation season, however, from 1862 to 1901, water for irrigating purposes was distributed along the course of the ditch in amounts varying from one hundred to eight hundred inches of water, none of which was returned at or above plaintiff's lands. All the other water diverted by the ditch was released before reaching French Ravine. In 1901 the flume crossing French Ravine broke down, and from that year until 1910 no water was conducted beyond that place. At all times between 1901 and 1910 all water taken from Wolf Creek by the dam and ditch was returned to the stream above plaintiff's lands and flowed on plaintiff's lands, where it was used by plaintiff.

Upon this history of the use of the water it was held that defendants, between the years 1901 and 1910, had forfeited all right to take any of the natural flow of Wolf Creek to any place outside of the watershed of that stream or that of Bear River, and had never recovered said right either by prescription or otherwise. In regard to all of the natural flow

of these streams, plaintiff as a riparian owner was found to have rights prior and superior to any which defendants might assert.

In 1909 defendants reopened Campbell Ditch, rebuilt the flume across French Ravine, and began to distribute at places beyond French Ravine and outside of the watershed of Wolf Creek and that of Bear River water varying in amount from five hundred to two thousand five hundred inches.

It was found by the court that Wolf Creek receives, and for more than half a century has received, in addition to its natural flow, water coming from sources without its watershed and known as "foreign water." This "foreign water" is made up of sewage from the city of Grass Valley and water discharged from mines and mills, the city, mines, and mills receiving their supply from a canal which leads from Yuba River. The canal is owned by persons not in privity with these litigants, or any of them, and not parties to this controversy. All of the discharges of "foreign water" enter Wolf Creek above the Campbell dam and commingle with the other waters of said stream. Said "foreign water" is never less than five hundred inches nor more than one thousand four hundred inches. The natural flow of Wolf Creek at the lowest stage is found to be always at least 1,191 inches.

It was further found by the court that plaintiff has a paramount right to the natural flow to its lands of the water in Wolf Creek and Bear River, but that defendants have a right superior to plaintiff to all of the "foreign water" at all times for use at any place within or without the watershed of Wolf Creek or Bear River.

The essential conclusions of law were that plaintiff is entitled to all of the natural flow to its lands; that defendants, as against plaintiff, have a right to use the "foreign water" not exceeding one thousand four hundred inches; and that plaintiff may have an injunction restraining defendants from diverting any save the "foreign water" from Wolf Creek. By the judgment which follows the conclusions of law, the title of plaintiff to the natural flow is quieted.

The principal question involved in this appeal is the following: Where the flow of a natural stream is augmented by artificial means, that is, by waters which, without the intervention of human agency, would never reach the stream, does this artificial flow inure to the benefit of riparian owners or

is it merely in the nature of abandoned personalty which may be appropriated by the first person who can take it from the stream?

Appellant agrees with respondents that the "foreign water" is an increment of Wolf Creek abandoned by those who produce it. While the right of the producers at any time to forsake the practice of putting water into Wolf Creek is conceded, the right of respondents, in the absence of any privity with said producers, to appropriate this surplus flow is denied. Appellant calls the court's attention to the case of *Arkwright* v. *Gell,* 5 Mees. & W. 203–226. In that case mine owners had drained their workings by a tunnel from which water was discharged in such a way that it flowed to plaintiffs and was used by them to operate mills. For the purpose of securing better drainage the owners of the mine dug a deeper tunnel, which caused the other to run dry. In this they were upheld on the ground that those creating the supply may discontinue it. In principle that case seems to fit the one point upon which appellant and respondents agree, namely, the right of the producer of the artificial flow to cease furnishing it, but appellant lays great stress upon the comment on the case in Washburn on Easements, fourth edition, at page 420, which is as follows:

"It will be remarked, as an important circumstance in this case, that the one who dug the second sough and caused the diversion was interested in the mines thereby to be drained. Had it been otherwise, had he been a stranger, or merely the owner of the land lying between the outlet of the first sough and the place where the water entered into the natural stream, he would have had no right to divert the current issuing from the mine, so as to deprive the plaintiff of the use of the water flowing in the same, after having enjoyed it so long." It is contended that as among all the rest of the world except the producer, the mingled stream of natural and artificially introduced water follows the usual law of watercourses, and that it is immaterial as between two claimants how the water got into the bed of the stream. In this behalf a number of authorities are cited, including *Wood* v. *Waud,* 3 Ex. 748; *Druley* v. *Adam,* 102 Ill. 177; *Eddy* v. *Simpson,* 3 Cal. 249, [58 Am. Dec. 408]; *Schulz* v. *Sweeny,* 19 Nev. 359, [3 Am. St. Rep. 888, 11 Pac. 253]; and *Hollett* v. *Davis,* 54 Wash. 326, [103 Pac. 423]. In the case last cited

it was held that the owner of a spring who diverts its waters into an artificial channel may not, after the lapse of the period of the statute of limitations, return the waters to their natural channel to the injury of a lower riparian owner on the watercourse through which the water has long been discharged. The case was decided upon the doctrine of estoppel and has little value here. The other cases were determined upon authority of decisions under the common law. *Eddy* v. *Simpson*, the Californian authority cited, was to the effect that producers of water who had abandoned it could not retake it from the stream into which it had been discharged if by so doing they prevented its application to the lands of lower riparian owners who had been making beneficial use of it; but in *Hoffman* v. *Stone*, 7 Cal. 46, this doctrine was modified and a ruling made, which has been consistently followed ever since, that an appropriator may use a natural watercourse as a part of the process of conducting the appropriated fluid to a place of storage. In that case it was held that only the natural water in the stream belonged to the first appropriator, and that the artificial water might be retaken by those who had discharged it into the watercourse. And in the leading case of *Katz* v. *Walkinshaw*, 141 Cal. 116–135, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], *Eddy* v. *Simpson* was cited during the discussion of the deviations from the common law which have been brought about by local necessities and the physical and climatic differences between England and California. Very early in the history of irrigation in California this court began to draw distinctions between the riparian rights recognized under the common law and the law of appropriation which was called a law of necessity, following custom rather than fixed conditions. In *Miller* v. *Wheeler*, 54 Wash. 429, [23 L. R. A. (N. S.) 1065, 103 Pac. 641], this difference is discussed and many cases are listed, the court citing with special approval and quoting from *Butte Canal & Ditch Co.* v. *Vaughn*, 11 Cal. 143, [70 Am. Dec. 769], wherein the right of the original appropriator of water again to take it after its discharge into an alien watercourse—a right denied in the case of *Eddy* v. *Simpson*—is again declared. It is unnecessary, however, to prolong the discussion of this phase of the case, because appellant admits that, under the authorities, the people who put the water brought from sources outside of the watershed

into Wolf Creek might at their pleasure discontinue such increment, leaving appellant without remedy.

If, then, the appellant can obtain no easement or right by adverse possession or user against the people at Grass Valley who add to the *corpus* of the stream, how, ask respondents, can plaintiff maintain the present action without first establishing a right to the use of this water? We can find no satisfactory answer to this question that will fit with appellant's contentions. Respondents invoke the rule of property that plaintiff must rely upon the strength of its own title and not upon the weakness of that of its adversaries. (Citing *Little Sespe Consolidated Oil Co.* v. *Bacigalupi,* 167 Cal. 381, [139 Pac. 802].) We can see no escape from the logic of the rule so invoked and its application to the conditions here presented for our consideration.

A riparian owner has a right to the usufruct of the natural water of the stream, but an appropriator of the waters artificially added is a taker of the *corpus* of that which exists in the stream only by virtue of its abandonment. So jealous have the courts of this state been for economy in the use of water and the fair apportionment of the precious fluid for beneficial purposes, that they have refused to restrain the diversion of water by a nonriparian appropriator, at the suit of a lower riparian owner, when the amount diverted would not be used by the latter but would greatly benefit the person diverting it. (*San Joaquin & Kings River Canal & Irr. Co.* v. *Fresno Flume & Irr. Co.,* 158 Cal. 626, [35 L. R. A. (N. S.) 832, 112 Pac. 182]; *Modoc Land & Livestock Co.* v. *Booth,* 102 Cal. 151, [36 Pac. 431]; *Fifield* v. *Spring Valley Water Works,* 130 Cal. 552, [62 Pac. 1054].)

In *Gallatin* v. *Corning Irr. Co.,* 163 Cal. 405, [Ann. Cas. 1914A, 74, 126 Pac. 864], the court was discussing a situation in which defendant proposed to divert for purposes of irrigation on nonriparian lands surplus water carried in a stream during periods of unusual flood. Injunction against defendants was refused when demanded by plaintiffs, who were lower riparian proprietors, on the ground that the taking of the flood waters wrought no present damage to said plaintiffs. After a review of the decisions applicable to the problem before the court, the following language was used in the decision:

"These decisions in effect establish the just rule that flood waters which are of no substantial benefit to the riparian owner or to his land, and are not used by him, may be taken at will by any person who can lawfully gain access to the stream, and conducted to lands not riparian, and even beyond the watershed, without the consent of the riparian owner and without compensation to him. They are not a part of the flow of the stream which constitutes 'parcel' of his land, within the meaning of the law of riparian rights."

In *Cohen* v. *La Canada Land & Water Co.*, 151 Cal. 680, [11 L. R. A. (N. S.) 752, 91 Pac. 584], the plaintiff sought to restrain defendants from diverting and carrying away certain waters developed by tunnels on lands from which plaintiff had conducted the flow of certain springs. It was found that the developed waters were not such as would under natural conditions find their way to the springs, and that, except for the tunnels, the supply thereby made available would have gone by percolation outside of the watershed of the stream on which plaintiff's land was located. Among other things the court said: "Under these circumstances, as the waters developed by the tunnels were not waters which would have trended toward or supported or affected any stream flowing by the land of appellant, nor any springs in or to the waters of which she had any claim or interest, she was not injured as an adjoining proprietor or as an appropriator, and hence could not complain or insist upon the application of the rule announced in the cases cited to prevent the respondents from taking such developed waters to any lands to which they might see fit to conduct them. For authority sustaining this proposition we cite *Hansen* v. *McCue*, 42 Cal. 306, [10 Am. Rep. 299], *Gould* v. *Eaton*, 111 Cal. 639, [52 Am. St. Rep. 201, 44 Pac. 319], and *Montecito etc. Co.* v. *Santa Barbara*, 144 Cal. 585, [77 Pac. 1113]."

So in the present case it may be said that as the surplus waters would not in the course of nature reach appellant's land, that corporation may not complain of being deprived thereof either by the producers of the excess, by their assignees, or by a stranger to their title who appropriated the abandoned excess for proper purposes.

Respondents cite *Dannenbrink* v. *Burger*, 23 Cal. App. 587, [138 Pac. 751], as supporting their contention that where water has been conducted into a stream other than that from

which it was taken and has been abandoned, the rights
therein are in the nature of those which one may enjoy in
personalty, the appropriator being entitled to the *corpus*
thereof rather than the usufruct.    The discussion in the opin-
ion in that case supports the contention of respondents, for
the following language is there used: ''It is well settled that
where water escaping or leaking from an artificial water-
course goes to waste by flowing promiscuously over other
lands or finds its way to some other stream than the one from
which it is diverted into such artificial watercourse, a person
appropriating such water thus merely takes the *corpus* and
not the usufruct therein.    In such case, having the usufruc-
tuary right in such water, the owner of such ditch or artifi-
cial watercourse is at liberty at any time to change or alter
it without invading any vested right of the appropriator, even
though the effect of such change or alteration must inevi-
tably result in depriving the appropriator of the water escap-
ing from such watercourse and which he has appropriated
and used, perhaps for a long period of time.    As is said in
*Hansen* v. *McCue,* 42 Cal. 303, [10 Am. Rep. 299], and ap-
proved in *Katz* v. *Walkinshaw,* 141 Cal. 116, [99 Am. St.
Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], the owner
of an artificial watercourse is not bound to maintain the arti-
ficial stream for the benefit of those who have appropriated
waters escaping therefrom. . . . In other words, the appro-
priator merely secures the *corpus* of the water thus escaping
as personalty, but does not thereby secure or acquire the
right to the continuous flow of such water.''
    We are convinced that plaintiff and respondents were upon
an equal footing with reference to the surplus water, and
that the ones who first secured it may not be deprived of the
right to the use of it, even outside of the watershed of Wolf
Creek, by the person or corporation claiming as a lower ripa-
rian proprietor on Bear River.    This disposes of the princi-
pal question involved herein, and our determination of this
matter is not altered by the opinion in *Schwann* v. *Cotton,*
[1916] 2 Ch. 459, dealing with a controversy between ripa-
rian proprietors in a jurisdiction in which our law of appro-
priation of waters has no application.    The case of *Davis* v.
*Gale,* 32 Cal. 26, [91 Am. Dec. 554], also cited in this behalf,
is of little value to us here, because the points decided were
so different from those involved in this controversy.    That

was a suit between appropriators, each claiming a priority, not a controversy based upon riparian rights of either party.

Appellant attacks the judgment upon the ground that it is not definite. That the amount of "foreign water" varies greatly at different periods during the year is found. Its maximum (one thousand four hundred inches) and its minimum (five hundred inches) are fixed by the findings, but it is argued that as the amount of the flow of the added water is never constant, and never will be, it is impossible to tell when respondents are going beyond the appropriation of the added water and taking from the natural flow. The effect of the judgment, says appellant, is to restrict it over the whole year to the minimum flow of natural water found to be in the stream at the end of the season. It is argued that the judgment is just as uncertain as that found erroneous for uncertainty in *Watson* v. *Lawson,* 166 Cal. 235–243, [135 Pac. 961]. An examination of the said judgment shows, however, that it is much more specific than the one described in the cited case. In that case defendants had been found by the superior court to be entitled to "sufficient water for the proper irrigation of so much of their several lands as they have heretofore irrigated with such water." As there was nothing to show the number of acres previously irrigated nor the amount of water such irrigation would require, the judgment was of course hopelessly indefinite. In the case at bar defendants are adjudged to be entitled to all of the "foreign water" not exceeding one thousand four hundred inches and are enjoined from taking more than that quantity. Conversely stated, the court forbade defendants to take more than would leave in the stream 1,191 inches of the water from Wolf Creek, which had been judicially determined to be the minimum quantity of natural water flowing at the intake of their ditch. Under the rule which favors the sustaining rather than the reversal of judgments, we must assume that the evidence (which is not set forth in this record) justifies the findings and that said judgment is in accordance with fairness and equity.

Certain of the respondents question the jurisdiction of the court to try this case and contend that they should have been awarded a judgment of dismissal under section 5 of article VI of the constitution of California. This, they say, is an action to quiet title to the waters of Bear River and its tribu-

taries, including Wolf Creek, and as the latter stream is entirely within the county of Nevada, they assert that the superior court in and for the said county alone had jurisdiction to entertain such a suit. The court found that plaintiff's right sought to be quieted was "a part and parcel of its Yuba County lands." The action was properly commenced and tried in Yuba County. (*Miller & Lux* v. *Madera Canal & Irr. Co.*, 155 Cal. 59–73, [22 L. R. A. (N. S.) 391, 99 Pac. 502]; *Lux* v. *Haggin*, 69 Cal. 255–391, [4 Pac. 919, 10 Pac. 674].) Plaintiff was seeking to quiet its right to the natural flow of Bear River at its lands in Yuba County. The mere fact that Wolf Creek has a separate name and extends through another county does not make it less a part of Bear River. (*Porters Bar Dredging Co.* v. *Beaudry*, 15 Cal. App. 751–765, [115 Pac. 951].)

It follows that respondents were not entitled to a judgment of dismissal.

The parts of the judgments from which appeals are taken are affirmed.

Shaw, J., Victor E. Shaw, J., *pro tem.*, Sloss, J., Wilbur, J., and Angellotti, C. J., concurred.

In denying a rehearing the court in Bank filed the following opinion on March 29, 1918:

THE COURT.—The petition for rehearing is denied.

The court does not construe the opinion herein as deciding the question as to what rights may be acquired in so-called "foreign waters" as between appropriators, or by prescription. The record in these cases presents a controversy between the plaintiffs claiming the waters in question solely by virtue of their lower riparian ownership of the banks of Bear River, of which Wolf Creek is a tributary, and the defendants claiming the right to divert the foreign waters of Wolf Creek by virtue of their appropriation and application of the same to beneficial uses.