[Sac. No. 5223. In Bank.—April 26, 1939.]

R. STEVENS et al., Respondents, v. OAKDALE IRRIGATION DISTRICT (a Public Corporation), Appellant.

Griffin & Boone for Appellant.

Gumpert & Mazzera and J. Calvert Snyder for Respondents.

THE COURT.—The sole question for decision is that of the right of plaintiffs, appropriators of foreign waters, to restrain the producer of the foreign flow (defendant irrigation

district) from increasing its beneficial use of such waters by recapturing them within its boundaries, thus cutting off their escape and drainage in accustomed manner down a natural stream channel to plaintiffs' land and point of diversion.

The trial court entered judgment decreeing that as against defendant, plaintiffs have the right to two cubic feet of water per second continuous flow in the creek over their land, perpetually enjoining any interference by defendant with this right, and awarding plaintiffs damages in the sum of $3,000, together with costs. Defendant has appealed.

Concerning the essential facts there is little dispute. The Stanislaus River, a typical western stream having its source in the high snows of the Sierra Nevada Mountains, flows in a general westerly direction across the San Joaquin Valley, and empties into the San Joaquin River. Lone Tree Creek is also a tributary of the San Joaquin River, but it flows from the low foothills of the Sierra Nevada range, and under natural conditions is fed solely by rain water from them, and not by the snows; therefore, it carries water only in the season of heavy rains, about October to May, and is dry during the remainder of the year. The watershed and drainage area of the Stanislaus River is entirely different from that of the Lone Tree Creek, and the meandering courses of the two streams are some five to fifteen miles distant one from the other.

The land of plaintiffs is located in an arid portion of the San Joaquin Valley, riparian to Lone Tree Creek, and for many years plaintiffs and their predecessors have utilized the waters of the creek for irrigation. Some seven miles upstream from this land of plaintiffs, the creek traverses the property of defendant irrigation district. Defendant district was organized in the year 1909. It covers an area of approximately 70,000 acres, which territory is susceptible of irrigation by waters diverted from the Stanislaus River. About the year 1912 defendant commenced to conduct water from the river through its irrigation ditches and laterals, and the portions of this flow which reached points without the watershed of the river but within the watershed of the Lone Tree Creek, were permitted to enter the creek bed as seepage, waste, and spill, and to drain down to plaintiffs' premises. The result was that after the year 1912 there was a continuous flow of water past plaintiffs' land in augmentation of the intermittent natural flow of the stream. In 1927,

at a cost of over $1,000,000, defendant constructed the Melones reservoir on the Stanislaus River, for the purpose of procuring storage water with which to continue irrigation after exhaustion of the normal flow of the river in the middle of summer. The use of this reservoir increased the amount of water available to defendant during the late summer for irrigation of its lands in the vicinity of Lone Tree Creek, and consequently created a corresponding increase and regularity of flow in the creek channel at plaintiffs' point of diversion. Subsequent to the year 1926, so the trial court found, this flow exceeded two cubic feet per second of water the year round. In 1927, plaintiffs filed notice of appropriation, followed by an application to the state division of water rights, and on July 15, 1929, received a permit to appropriate, from April first to November thirtieth of each year, two cubic feet per second continuous flow over and across their land of waters of the creek. They thereupon commenced the construction of an adequate diverting system, including dam, laterals, ditches, and canals. In all, during the next few years, they expended in excess of $7,000. The trial court found that defendant had knowledge of this construction work.

In the spring of 1934, defendant, for the first time, manifested an intention to recapture the waste, spill, and seepage water from the creek, and to reapply it to beneficial uses. At a point within its own boundaries, and above the land of plaintiffs, it built a dam and commenced to pump from the creek, thus depriving plaintiffs of the flow from which they had been irrigating an average of 100 acres each year. In the fall of 1934, defendant removed the dam, in its place dug a large sump in the course of the creek, and established a pumping plant therein. As a result of this activity plaintiffs were deprived of water during the irrigating seasons of the years 1934, 1935, and 1936, and were unable to raise and mature crops on their land, to their damage in the sum of $3,000.

The present action was commenced in July, 1934, but by supplemental pleadings the issues were enlarged to embrace defendant's activities up to the fall of 1936. Plaintiffs' final prayer was for the recovery of damages sustained up to that time, and for an injunction restraining defendant from maintaining the sump and pumping plant, and compelling it to permit the water to drain down the stream channel in

accustomed manner. By its pleadings defendant asked for a declaration of its ownership and right to use all of the waters flowing into the creek as a result of its operations.

No issue whatsoever was raised concerning the respective rights of the parties in and to the natural flow of the creek. The sole subject of controversy was the status of the foreign waters brought into the creek watershed by defendant. Furthermore, plaintiffs attempted to limit even this issue, in that they did not claim a right to compel defendant to continue importation of the foreign flow, but merely asserted that they were entitled to enjoin defendant from recapturing it after it had once drained into the channel of the creek.

Upon trial of the cause the court found, in addition to the facts which have already been related, that from 1912 to the spring of 1934 plaintiffs and their immediate predecessors made complete beneficial use, to and including the amount of two cubic second feet, of all seepage, waste, and spill water flowing in the creek during the irrigation seasons of each year, and that such use was open, notorious, continuous, uninterrupted, under claim of right, and hostile and adverse to the rights of any other person in and to use of the water during said periods. Further the court found it to be true that the "defendant abandoned its rights to the water it allowed and/or allows to get into Lone Tree Creek as seepage, waste and spill", and that plaintiffs acquired a right to two second feet continuous flow prior to the time that defendant manifested any intention of attempting to recapture the waste, spill, and seepage water from the creek. Upon these premises the court rested its conclusion and judgment that plaintiffs, as against defendant, have the right to take all of the water flowing in the creek to the extent of two cubic second feet continuous flow over their land, and that defendant is perpetually enjoined from in any manner interfering therewith.

Defendant seeks a reversal of the judgment, contending that the real purport of the adjudication is to impress upon it a duty to continue to conduct from the Stanislaus River, and pass through its irrigation system, a constantly sufficient quantity of water to produce a flow in Lone Tree Creek equal to plaintiffs' requirement. Apart from the question of the scope of the judgment, this contention touches the principal point of dispute on this appeal, to wit: What is the extent of.the right which a down-stream proprietor, by appropria-

tion and use of abandoned foreign water, may acquire against the producer of the flow?

It is plaintiffs' theory that, regardless of whether a lower claimant may compel continuance of importation of a foreign water supply, once such water has actually been conducted into the foreign watershed and drained into a natural watercourse therein, the further interception or recapture of the flow by the producer may constitute an invasion of a right thereto acquired by the lower claimant—and this despite the fact that the retaking occurs before the water leaves the control of the producer or passes the boundaries of his land. Defendant, on the other hand, vigorously asserts that the lower appropriator of the foreign supply is not only without right to enforce continued importation of the water into the second watershed, but he is also without right to compel the producer to continue abandoning any particular portion of the flow. The status of the imported water is not changed, according to defendant, by the mere fact that the producer, upon his own property within the second watershed, uses the channel of a natural watercourse as a temporary conduit or drain, retaking the water therefrom for further beneficial application within his boundaries.

It is the general rule, probably subject to exceptions not here involved, that the producer of an artificial flow is for the most part under no obligation to lower claimants to continue to maintain it. At any time he may forsake the practice, and lower users will not have acquired a right against him, either by appropriation or prescription, to continued augmentation of the natural volume of the stream. (*E. C. Horst Co.* v. *New Blue Point Min. Co.*, 177 Cal. 631 [171 Pac. 417]; *Hagerman Irr. Co.* v. *East Grand Plains Drainage Dist.*, 25 N. M. 649 [187 Pac. 55]; Wiel, Mingling of Waters, 29 Harvard Law Review, 137; 25 Cal. Law Review, 124.) While rights may be acquired by lower proprietors in and to such portions of the foreign flow as have been abandoned by the producer and thus made available for other use, these rights are always subject to the contingency that the supply may be intermittent or may be terminated entirely at the will of the producer. In other words, although the fact that the producer may discontinue the foreign supply does not preclude others from acquiring a right to it. when and if it exists, such fact does affect the value of the right so acquired, in that its permanency is not

assured. (*Crane* v. *Stevinson*, 5 Cal. (2d) 387, at page 394 [54 Pac. (2d) 1100].) Mr. Wiel, discussing in the article on Mingling of Waters, *supra*, the restricted point of the effect of the negative act of the producer of a foreign flow in failing to keep up the addition to the second stream states:

''He (one who conducts water from First River into the watershed and stream channel of Second River) . . . has the ownership of the right to the flow of First River to the intake of his conduit, and, it may be, the ownership of such specific water as is actually passing through his works, but the water that has left the mill and has gone down Second River is again neither his property nor anyone's. It is however, affected by the important consideration that its continued going is not of natural but is of artificial cause; it is not a natural body of water, nor a natural formation; its existence as a whole depends upon the action of this man. It is from this consideration, and not from ownership of any water as such, that a question first arises between him and lower claimants upon Second River. As a result he is, for the most part, under no obligation to them to continue to maintain the flow. At any time or in any manner he pleases he may act upon the water at a point above where it leaves his control, although the result is to stop the flow into Second River. He may be in the situation in this respect of having a right as to lower parties to have the water drain down Second River, without right in them to have him continue exercising his right, just as a right-of-way over another's land is no evidence that the party entitled thereto is under duty to walk. . . . Maintaining for years a pump which leaked water onto a neighbor's land, creates no duty that the pump must go on leaking. The millowner may cease to operate his conduit across the divide, or may cease to operate his mill, or his water wheels, or may change his location, or otherwise take away or alter, in whatever way he pleases, the artificial source of the flow into Second River. This principle is well settled in the decisions.''

It follows that plaintiffs in this action cannot predicate their claims upon any acquired right to compel defendant district to continue the importation of water from the Stanislaus River into Lone Tree Creek.

The problem then is to determine whether plaintiffs have acquired any lesser right against defendant which entitles them to the relief accorded by the trial court herein, such as

a right to compel defendant, if and when it has imported the water, to maintain its past practice of abandoning in the channel of the creek within its boundaries, a sufficient supply to fill plaintiffs' requirements. Stating the question another way, where the producer of an artificial flow does not decrease it at the source, but after importing it, acts upon it a second time while it is still within his land and before it leaves his control, does the doctrine above set forth apply, or may lower proprietors assert a right to enjoin any decrease in the volume of abandoned water?

In finding the solution of this problem, the distinction must be observed between abandonment by one who creates an artificial flow, of his water right (the right to divert and use the water of the first stream), and abandonment of used water itself (the very body or *corpus* thereof), after it has been imported into the second watershed. (See Kinney on Irrigation and Water Rights, 2d ed., vol. 2, p. 2005, sec. 113 et seq.)

█ Waters brought in from a different watershed and reduced to possession are private property during the period of possession. When possession of·the actual water, or *corpus,* has been relinquished, or lost by discharge without intent to recapture, property in it ceases. This is not the abandonment of a water right, but merely an abandonment of specific portions of water, i. e., the very particles which are discharged or have escaped from control. (*E. C. Horst Co.* v. *New Blue Point Min. Co., supra; Rock Creek Ditch, etc.,* v. *Miller,* 93 Mont. 248 [17 Pac. (2d) 1074, 89 A. L. R. 200, 204].) So in the present case, for example, there has been no abandonment by defendant of a water right, but only an abandonment of those portions of the imported water which have actually been permitted to drain down to plaintiffs' land. As to this specific flow, discharged without intent to recapture, the abandonment has been complete, and plaintiffs have properly exercised a right to take the waters at their point of diversion. Defendant, having no further interest in the discharge, could not have stopped them ⸗ so doing. But this past abandonment by defendant of tain water, as distinguished from a water right, has not ⸗ ferred upon plaintiffs any right to compel a like aband⸗ ment in the future, or to control defendant's use upon ⸗ own land of such water as it imports. The principle ⸗ clearly stated in *Dannenbrink* v. *Burger,* 23 Cal. App. 58⸗

596, 597 [138 Pac. 751], where in part it is said: ''The lower claimant who received and put to use this water would only have a right to use it, for any purpose to which it was applicable, so long as it continued there. Time would raise no presumption of a grant nor found any claim to a continuance of the discharge. . . . In other words, the appropriator merely secures the *corpus* of the water thus escaping as personalty, but does not thereby secure or acquire the right to the continuous flow of such water.''

While at first blush the above doctrine might seem a harsh one in its present application because plaintiffs here have expended a considerable sum for the construction of diversion works in the mistaken expectation that the foreign flow past their property would be permanent, upon mature consideration the injustice which would result if the rule were to the contrary is plainly to be seen. Defendant irrigation district has expended vast sums for the erection of the storage and diversion facilities which make possible the bringing of a continuous flow from the Stanislaus River to the Lone Tree Creek watershed. The development of any irrigation district must necessarily be a gradual one. A perfection of the system to the point where fullest beneficial use is made of all water passing through the irrigation works is not attained in a day. As a district is brought to the peak of development, an increasing use of water may be anticipated, and also a more efficient method of use, with resultant decrease in the amount of abandoned waste, spill, and seepage. In this process of growth, the discharge of a considerable volume of artificial flow over a long period of formative years should not and does not invariably constitute an abandonment by the district of its right to such waters, or impose upon it a duty to always maintain the same volume of discharge. In this connection, the following observation made in a case concerning the government's right to recapture waste waters is pertinent:

''One who, by the expenditure of money and labor, diverts appropriable water from a stream, and thus makes it available for fruitful purposes, is entitled to its exclusive control so long as he is able and willing to apply it to beneficial uses, and such right extends to what is commonly known as wastage from surface run-off and deep percolation, necessarily incident to practical irrigation. Considerations of both public policy and natural justice strongly support such

a rule.'' (Note 89 A. L. R. 212, quoting from *United States* v. *Haga,* 276 Fed. 41.)

To summarize, one who produces a flow of foreign water for beneficial use and thereafter permits it to drain down a natural stream channel, is ordinarily under no duty to lower claimants to continue importing the supply or to continue maintaining the volume of discharge into the second stream channel at any fixed rate. The rule may have exceptions, as perhaps where the artificial condition has become inherently permanent and there has been a dedication to the public use, or where the drainage is stopped wantonly to harm a lower party, without other object. ██ But as a general proposition, an irrigation district, after importing water from one river, passing it through irrigation works, and discharging it into a natural creek bed in the second watershed, may change the flow of water imported or the volume of water discharged from its works into the second stream, or stop the flow entirely, so long as this is done above the point where the water leaves the works of the district or the boundaries of its land. An exception to the rule is not created by the fact that the district may act upon the water a second time while in its possession, by retaking it at a point of drainage for further beneficial application.

In the present case the recapture of the water from the stream channel by defendant district, upon its own land, and the use of the channel as a temporary drain, neither adds to nor detracts from plaintiffs' claims to the artificial flow. ██ The right to use a natural channel as a temporary conduit or as a drain for artificial flow has been frequently upheld. See cases digested in note, 89 A. L. R. 210. There are cases where even after a foreign flow has left the land and control of its producer, he has been permitted to recapture it from the second stream, when it has been shown that such recapture was a part of his original project, and the water was discharged into the stream, not simply to be rid of it, but for the express purpose of retaking at a lower point. ██ Where the recapture occurs before the foreign flow passes from the lands and control of the producer there can be no doubt of his right to make temporary use of a channel traversing his property, so long as normal conditions on the stream are not injuriously affected thereby. In such case the stream bed merely serves the purpose of the drainage ditch which might be constructed were no natural chan-

nel available. (See *Hoffman* v. *Stone*, 7 Cal. 46; *Butte Canal & Ditch Co.* v. *Vaughn*, 11 Cal. 143 [70 Am. Dec. 769]; *E. C. Horst Co.* v. *New Blue Point Min. Co., supra,* at p. 636; 26 Cal. Jur., p. 143 et seq.; Kinney on Irrigation and Water Rights, 2d ed., vol. 2, p. 1457 et seq.; Wiel on Mingling of Waters, *supra.*)

Plaintiffs suggest, although with little vigor, that the doctrines of estoppel, adverse possession, or nonuser may be invoked to sustain their position. The findings of the court bearing on these subjects have already been set forth. The most that can be said on behalf of plaintiffs is that defendant, with knowledge of plaintiffs' construction of diversion works, stood silent. But in the absence of other essential elements neither expenditures by plaintiffs, defendant's knowledge thereof, nor its silence are sufficient to establish an estoppel. There is no showing whatsoever of any degree of turpitude in the conduct of defendant which would estop it from assertion of its title before a court of equity. (See *Biddle Boggs* v. *Merced Min. Co.*, 14 Cal. 279, 367 et seq.; *Dougherty* v. *Creary,* 30 Cal. 290, 291 [89 Am. Dec. 116]; *Stockman* v. *Riverside L. & I. Co.*, 64 Cal. 57 [28 Pac. 116]; *Verdugo Cañon Water Co.* v. *Verdugo,* 152 Cal. 655, 674 [93 Pac. 1021]; Kinney on Irrigation and Water Rights, 2d ed., vol. 2, p. 2034 et seq.; Wiel, Water Rights in the Western States, secs. 593, 594, 3d ed., vol. 1.) As to adverse possession, it is apparent that plaintiffs' taking of the foreign water at its point of diversion was not hostile to defendant's title, but was a mere taking of certain water (the *corpus* as distinguished from the water right), to which defendant had relinquished all claim.

The judgment is reversed.

Houser, J., concurred in the judgment.

Rehearing denied.