[Civ. No. 18411. Third Dist. Feb. 1, 1980.]

NEIL ROBINSON et al., Plaintiffs and Respondents, v.
NEVADA IRRIGATION DISTRICT, Defendant, Cross-defendant
and Appellant;
WILBUR D. MAY, Cross-complainant and Respondent.

## COUNSEL

Minasian, Minasian, Minasian, Spruance & Baber and Paul R. Minasian for Defendant, Cross-defendant and Appellant.

Kronick, Moskovitz, Tiedemann & Girard, Frederick G. Girard, Paul M. Bartkiewicz and Charles A. Barrett for Plaintiffs and Respondents.

Parker, Milliken, Clark & O'Hara, Nowland C. Hong and Allen L. Gilbert for Cross-complainant and Respondent.

## OPINION

**GROSSFELD, J.** *—Defendant Nevada Irrigation District appeals from a judgment of the Superior Court of Nevada County wherein defendant was ordered, in addition to the payment of damages, to provide certain water to plaintiffs at a specified price pursuant to a contract dated May 12, 1918. Subsequently, in accordance with a stipulation of defendant and cross-complainant May, defendant's appeal as to May was dismissed.

As such this appeal concerns itself principally with the trial court's interpretation of the May 12, 1918, contract executed by the predecessors in interest of plaintiffs and the predecessor in interest of the defendant,[1] hereinafter referred to as District. The contract provided that its provisions "shall inure to the benefit of the parties of the first part herein [landowners] their heirs and assigns, and shall be deemed and taken as a covenant running with the land."

The basic purpose of the "1918 contract" was that in return for an easement through the property now owned by plaintiffs, the District

---

*Assigned by Chairperson of the Judicial Council.

[1]Defendant District is a successor to Jacob Weissbein as trustee for the New Blue Point Mining Company. Plaintiffs are the successors in interest to the landowners designated in the 1918 agreement as parties of the first part.

would sell and deliver to plaintiffs certain "foreign water" at the rate of $6 per acre[2] so long as certain conditions continued to exist.

The District ceased providing water at $6 per acre to May in 1968 and ceased supplying it at $6 per acre to plaintiffs in 1972, but continued to provide it to them at the current rate for other users in the District. The difference in cost (which provided the measure of damages) was between the $6 provided in the agreement and approximately $30, which was about the average current rate. This lawsuit resulted.

The subject contract contained certain key provisions which are pertinent: 1) It provided for delivery of "foreign water" into a ditch on plaintiffs' and May's land for irrigation during each season "forever" so long as there was sufficient "foreign water" and the District had the legal right to such water. 2) If the District lost the right to the water by litigation or otherwise, all obligation to deliver water would end and all obligations of plaintiffs and May would terminate and the easement would cease. 3) If the District failed to deliver water at the times provided for irrigation, and the failure continued for one year after written notice thereof and demand therefor, "provided there was sufficient water for the purpose belonging to the water rights owned or claimed by [the District], and which has heretofore supplied said ditch," then the easement for the ditch would cease.

As will hereinafter be discussed District contends on appeal that the trial court erred in its interpretation of the Supreme Court decision in the case of *E. C. Horst Co.* v. *New Blue Pt. Min. Co.* (1918) 177 Cal. 631 [171 p. 417], and that the conditions provided for in the contract which would terminate District's obligations thereunder have occurred. District further contends that the trial court erroneously applied the doctrine of estoppel to District.

### DISCUSSION

 The subject contract was executed just after the aforesaid decision of the California Supreme Court in the case of *E. C. Horst Co.* v. *New Blue Pt. Min. Co., supra,* 177 Cal. 631. Plaintiffs and District dis-

---

[2]The contract itself does not define "per acre." However, our examination of the record indicates that "per acre" is the amount of one-half statutory miner's inch per acre for an irrigation season commencing April 15th and running through October 31st of each year.

agreed as to the exact extent of the water rights delineated by the Supreme Court in the *Horst* case, but the trial court in the instant proceeding concluded that the Supreme Court decided that Blue Point Mining Company (the District's predecessor) had full rights to *all* "foreign" water which found its way into Wolf Creek. At that time, such "foreign" water was water which was imported into the Wolf Creek-Grass Valley watershed area from the Yuba River by a series of canals.

Wolf Creek was, in turn, the source of the water which was diverted by Blue Point Mining Company into the ditch (known as Tarr Ditch, formerly Campbell Ditch) which ran through the plaintiffs' and May properties and is the subject of this action. Our reading and interpretation of the *Horst* case is the same as the trial court.

The trial court made additional findings which are crucial to this appeal. It found that "foreign water" which the *Horst* case dealt with was meant by the Supreme Court to be *any* water from outside the Wolf Creek watershed, not just the specific water known to be from certain sources, such as "sewage from the city of Grass Valley and water discharged from mines and mills, the city, mines and mills receiving their supply from a canal which leads from Yuba River." (*Id.*, at p. 634.) We agree with the trial court, from our reading of the entire *Horst* decision, that the quoted language from the *Horst* decision was *descriptive* and *explanatory*—not *restrictive* or *definitive*. (*Id.*, at p. 635.) Accordingly, as found by the trial court, the concept of "foreign water" is not restricted in the *Horst* decision to any particular *type* of water but is defined in terms of its *source*, i.e., any water from outside the Wolf Creek watershed.

Given the fact the contract was executed but three months after the *Horst* decision and Blue Point Mining Company was involved in both the case and the contract, it is obvious to us by the language of the contract that the parties contracted with that decision in mind.

The trial court further found that under the definition of foreign water used in the *Horst* case there has "always been and is now sufficient water from Yuba River in Wolf Creek at the Tarr Ditch diversion to serve [plaintiffs' and May's] lands." The fact that the foreign water owned by the District which is now in Wolf Creek is not sewage or water from mines or mills, but is water imported from the Yuba River watershed by means of what is known as the DS Canal, constructed in

1922, was not found by the trial court to be controlling. Instead, the trial court found and concluded as follows:

"7.

"There has always been and is now sufficient foreign water from the Yuba River in Wolf Creek at the Tarr Ditch diversion to service plaintiffs' and May's lands.

"8.

"The conditions referred to in the 1918 Agreement, the existence of which would relieve NID [District] of its obligations to supply water to plaintiffs and May at the $6.00 rate have not arisen.

"9.

"NID has not lost by litigation or otherwise the right to use the foreign water in Wolf Creek.

"10.

"NID itself is now and has for many years been the importer of the foreign water to the Wolf Creek Watershed.

"11.

"All conditions precedent or subsequent set forth in the 1918 Agreement relating to NID's obligation to provide water to plaintiffs' lands at the $6.00 per acre rate have been satisfied.

"12.

"From 1928 to 1972, NID supplied plaintiffs with foreign water pursuant to the provisions of the 1918 Agreement with full knowledge of all the facts set forth herein, and plaintiffs and their predecessors have for over forty years in irrigating and developing their lands justifiably relied upon the conduct of NID in supplying said water pursuant to said 1918 Agreement. [¶] In 1967, NID first supplied May with foreign water pursuant to the provisions of the 1918 Agreement with full knowledge of all the facts set forth herein, after first refusing to supply such water.

## "13.

"In 1972 NID for the first time refused to supply foreign water to plaintiffs' lands at the rate of $6.00 per acre as provided by the 1918 Agreement, and NID required plaintiffs to pay a price substantially in excess of $6.00 per acre for foreign water during 1972, in each year thereafter. [¶] In 1968, NID refused to supply foreign water to May's land at the rate of $6.00 per acre as provided by the 1918 Agreement, and NID has required May to pay substantially in excess of $6.00 per acre for foreign water thereafter if May desired such water.

## "14.

"This court finds that NID's refusal to supply foreign water to plaintiffs' lands at the rate of $6.00 per acre as provided by the 1918 Agreement was without right and unlawful, and that plaintiffs are entitled to a declaratory judgment, injunctive relief, and damages for NID's failure to provide foreign water to plaintiffs' lands at the rate of $6.00 per acre rate as provided in the 1918 Agreement. This court further finds that NID's refusal to supply foreign water to May's land at the rate of $6.00 per acre as provided by the 1918 Agreement was without right and unlawful, in the event that a final decision is rendered by the Federal Courts in the matter of *Wilbur D. May* v. *Nevada Irrigation District*, United States District Court Civil Case Number S-706 that the right claimed by May pursuant to the 1918 Agreement was not extinguished. In the event that the Federal Court renders a final judgment that the right claimed by May was extinguished this court finds that NID's refusal to supply foreign water to May's lands at the rate of $6.00 per acre as provided by the 1918 Agreement was not without right and was not unlawful."[3]

## "15.

"This Court finds that the 1918 Agreement is not unlawful, unjust, unreasonable, injurious or contrary to public policy, and that NID is required to deliver to plaintiffs' lands the foreign water in Wolf Creek at

---

[3]The United States Court of Appeals for the Ninth Circuit filed its opinion on July 17, 1979, affirming the decision of the United States District Court which held that May's right pursuant to the "1918 Agreement" was extinguished. No appeal to the United States Supreme Court was filed. (See stipulation of district and May filed with this court on Sept. 24, 1979.) Hence, further references to May in the trial court's findings of fact and conclusions of law have been omitted by this court.

the rate of $6.00 per acre so long as those foreign waters are available. . . .

"CONCLUSIONS OF LAW

"1.

"Plaintiffs', . . . and defendant, NID's predecessor in interest entered into the 1918 Agreement for consideration, and it was and is a valid and binding enforceable agreement, and it runs with the land.

"2.

"That any conclusion of law that may appear in the foregoing findings of fact are incorporated herein by reference.

"3.

"The Horst decision gave New Blue Point Mining Company the right to use all of the foreign water which found its way into Wolf Creek, and the references to Grass Valley sewage, mine discharges, etc., in the Horst decision are descriptive terms and not restrictive definitions.

"4.

"It is this foreign water that is to be supplied to plaintiffs' . . . under the 1918 Agreement.

"5.

"NID, as a successor to the New Blue Point Mining Company, is now the owner of the foreign water which finds its way into Wolf Creek.

"6.

"NID is now the importer of the foreign waters to Wolf Creek.

"7.

"NID is obligated under the 1918 Agreement to provide any foreign water owned by it which may be in Wolf Creek to plaintiffs' lands and

this obligation is not affected by the manner in which those foreign waters reached Wolf Creek, or by NID's motivation in importing those foreign waters to the Wolf Creek Watershed....

## "8.

"All conditions precedent or subsequent to NID's obligation to perform under the 1918 Agreement have been satisfied, and none of the conditions which might relieve NID of its obligation to perform under the 1918 Agreement have arisen.

## "9.

"NID is estopped by its conduct over the many years from claiming a right to terminate or discontinue the delivery of foreign water to plaintiffs' lands at the $6.00 per acre rate as provided in the 1918 Agreement, and as long as there are foreign waters in Wolf Creek that are available to NID it shall deliver those foreign waters to plaintiffs' lands at the $6.00 per acre rate as provided by the 1918 Agreement.

## "10.

"Plaintiffs are entitled to a declaratory judgment, and to recover damages for NID's failure to provide foreign water to plaintiffs' lands at the $6.00 per acre rate as provided in the 1918 Agreement, the amount of said damages to be determined by this court at a hearing which will be hereinafter set for that purpose."

We are not confronted with a challenge on this appeal to the sufficiency of the evidence to support the findings of fact.[4] It is essentially the conclusions of law and, more precisely, the construction of the contract, which are at issue.

█ There are three basic rules governing review by an appellate court of an interpretation made by a trial court of a contract or other written instrument. The first involves situations in which extrinsic evidence has been admitted as an aid to interpretation and it is in

---

[4]Were we to be presented with such a challenge our study of the record would compel us to reject it, since we are of the view there is substantial evidence to support the findings of fact. (See *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

conflict. ▇ The second is where no extrinsic evidence has been introduced and interpretation is based solely on the terms of the contract itself. ▇ The third is when extrinsic evidence is introduced but is not in conflict. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 257, p. 4248.)

▇ In the first situation, the rule is that an appellate court is bound by the trial court's resolution of conflicts in the evidence and any reasonable construction of the instrument by the trial court will be upheld. (See *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747 [131 Cal.Rptr. 873, 552 P.2d 1169].)

▇ In the second situation, the reviewing court will give the instrument its own interpretation completely independently of that of the trial court. (See *Davies Machinery Co.* v. *Pine Mountain Club, Inc.* (1974) 39 Cal.App.3d 18, 23 [113 Cal.Rptr. 784].)

▇ In the third situation, since there is no conflict in extrinsic evidence and no problem of credibility, but only of inferences to be drawn therefrom, this rule is the same as in the second situation, i.e., the appellate court must make an independent construction or determination of the meaning. (See *Western Camps, Inc.* v. *Riverway Ranch Enterprises* (1977) 70 Cal.App.3d 714, 723 [138 Cal.Rptr. 918].)

▇ In the case we have before us, the basic probative evidence is not in conflict. There was "foreign water" in Wolf Creek which was diverted into Tarr Ditch at the time the contract was executed. That "foreign water" consisted of the water which originated in the Yuba River watershed and after use was released from various mining and milling operations and Grass Valley sewage. Today, there is still "foreign water" in Wolf Creek available for diversion into Tarr Ditch but it is a different type of "foreign water," i.e., it consists of water imported into the watershed by the District, still from the Yuba River watershed but now for direct District use, by transporting it *through* the Tarr Ditch and intended by the District for use at the lower end of that ditch beyond plaintiffs' land. These essential facts are not disputed, since they were developed by testimony of two of the District's engineers who were the only witnesses in the case.

Accordingly, we shall deal with the District's contentions on appeal in light of our own independent interpretation of the contract.

## I

The District contends the condition precedent provided in the 1918 agreement that no water need be supplied by the owner of the ditch at the $6 rate unless there is water available from the water rights of the New Blue Point Mining Company has occurred, and the New Blue Point Mining Company water rights cannot be expanded to include waters intentionally placed in Wolf Creek by the District whether from a foreign water source or some other source by the District.

We disagree that the condition has occurred or that any water rights were "expanded" by the trial court's interpretation of the contract. It is true, as argued by the District, that the particular type of water which happened to constitute the "foreign water" in Wolf Creek in 1918 has ceased to exist, but other water as to which the District has rights and which is equally as foreign (albeit of a different type) is present. It is the presence of the "foreign water" (not what "kind" of water it is or its source) that is the crucial element, as we have indicated hereinbefore, and in light of our foregoing discussion no more need be said as to this contention.[5]

## II

■ The District contends the contract contains a condition subsequent and this condition has occurred, thus relieving the District of its obligation to provide any water to plaintiffs.

The District has reference to the language in the contract which provides that if it fails to deliver water at the times provided for one year after written notice thereof, the ditch easement automatically reverts to the landowners (plaintiffs). The District argues that since *$6 water* has not been delivered for more than one year and demand has been made, the easement has terminated. This, according to the District merges the easement with the land and terminates the covenant running with the land, which is the only thing upon which plaintiffs could legitimately base a lawsuit.

---

[5]It is incumbent upon us to note at this point that while it can be argued that there is conflicting evidence as to *some* points constituting findings of the trial court, none of these points are determinative of the issues on appeal; and further, that we have also applied the *first* rule of judicial review of documents recited above to the trial court's interpretation of the contract and have found it reasonable.

The contract does indeed contain a provision somewhat as described by the District.[6] We do not interpret this language as some form of a liquidated damages provision foreclosing a lawsuit for declaratory relief or for damages for breach of contract, as has occurred in the suit before us. Moreover, the trial court specifically found that "[a]ll conditions precedent or subsequent set forth in the 1918 Agreement relating to [the District's] obligation to provide water to plaintiffs' lands at the $6.00 per acre rate have been satisfied." The District does not attack this finding on the ground it is not supported by substantial evidence. Nor does the record make a showing there was not sufficient "foreign water" to make the promised deliveries. The trial court found, on substantial evidence in the record, to the contrary. We hold, as did the trial court, the failure of the District to make delivery at the agreed upon price did not "extinguish" the contract, as argued by the District, so as to remove the right to sue on the contract or prevent the action now before us on appeal. (See *Nelson* v. *Spence* (1960) 182 Cal.App.2d 493 [6 Cal.Rptr. 312].)

## III

■ The District challenges the trial court's conclusion that the District is estopped by its conduct over the years from claiming a right to terminate the $6 water so long as there are "foreign waters" in Wolf Creek available to the District.

The challenge is not based entirely on governmental immunity from estoppel, for the District concedes a governmental agency may be estopped on proper occasions. (See *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423].) The District relies principally on its assertions that one of the four basic elements for estoppel is missing, i.e., detrimental reliance by plaintiffs on conduct of the District such as to induce them to believe the $6 water would be delivered. It is claimed the record contains no evidence of detrimental

---

[6]"[I]n the event the party of the second part [New Blue Point Mining Co.]...shall fail to deliver water to the parties of the first part [landowners] at the times as hereinbefore provided and said failure shall continue for one year after written notice thereof, and demand therefor, provided there is sufficient water for said purpose belonging to the water rights owned or claimed by [New Blue Point Mining Co.], and which has heretofore supplied said ditch, then and in that event the right of way and easement herein granted to the party of the second part [New Blue Point Mining Co.] shall immediately cease and determine and shall immediately revert to the parties of the first part [landowners], *and all rights of the* [New Blue Point Mining Co.] thereunder shall be forfeited and at an end."

reliance other than the fact that plaintiffs (and their predecessors) *used* the water as it was delivered for a long period of time and were aware of the contract. The District also claims its past conduct could not be reasonably interpreted as intending to represent a promise of permanent delivery of foreign water or not to assert its rights under the contract. Having determined this judgment should be affirmed on grounds we have previously discussed, we are not required to reach this issue of estoppel. However, we have decided to do so.

It is true that the record contains no express testimony of plaintiffs that they relied upon the District in the sense necessary for estoppel. However, it is plain from the record that the trial court rested its decision as to estoppel upon the long-term record of supply and use of the water to the lands in question according to the terms of the contract. (See *Sawyer* v. *City of San Diego* (1956) 138 Cal.App.2d 652, 662 [292 P.2d 233].) We find the doctrine of estoppel to have been properly applied by the trial court under the facts and circumstances of this case.

It will no doubt be felt by some (certainly including the District) that the result in this case is inequitable. The short answer is that we are dealing with the solemn and formal obligations of contract law. The contract involved in this case is an excellent illustration of the economic and legal hazards of binding oneself, and especially one's heirs and assigns, to a long-term binding agreement involving the delivery of goods or services without inserting provisions for adjustment due to inflationary or deflationary economic cycles.

The District, of course, is not without private remedies; it may purchase the contract rights at an agreed price.

The judgment is affirmed.

Regan, Acting P. J., and Reynoso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 27, 1980.